## NATIONAL LABOR RELATIONS BOARD v. ILLINOIS TOOL WORKS.

No. 7420.

Circuit Court of Appeals, Seventh Circuit.

Feb. 27, 1941.

Rehearing Denied May 17, 1941.

TREANOR, Circuit Judge, dissenting in part.

————◆————

Robert B. Watts, Gen. Counsel, and Richard C. Barrett, both of Washington, D. C., for petitioner.

Edwin W. Roemer, Alfred T. Carton, and Henry A. Gardner, all of Chicago, Ill., for respondent.

Before SPARKS, MAJOR, and TREANOR, Circuit Judges.

SPARKS, Circuit Judge.

The National Labor Relations Board has filed its petition in this court for the enforcement of its order against respondent pursuant to Section 10(c) of the National Labor Relations Act. 29 U.S.C.A. Sec. 151 et seq. Respondent is an Illinois corporation, operating plants at Chicago and Elgin, Illinois, and Toronto, Canada. The labor practices complained of are alleged

to have occurred at Elgin, and remotely at Chicago.

The charge before the Board was filed in the name of the International Association of Machinists, affiliated with the A. F. of L., on April 22, 1939. On the same day the Board issued its complaint against respondent, charging it (1) with having discharged Harrison S. Van Delinder, one of its employees, because he joined and assisted the Union; (2) with having employed labor spies in its Chicago plant continuously since July 5, 1935; and (3) that by these and other acts (not naming them) respondent had engaged and was engaging in unfair labor practices within the meaning of Section 8(1) and (3) of the Act.

Respondent filed its answer admitting the jurisdictional allegations, but denying that it had engaged in unfair labor practices. A hearing was held at Elgin, Illinois, on May 8 and 9, 1939, before a trial examiner designated by the Board. On June 23, 1939, he filed an intermediate report in which he found that respondent had not engaged in the alleged unfair labor practices and recommended that the complaint be dismissed.[1]

The Union filed exceptions to the intermediate report and on November 27, 1939, the Board rendered its findings of facts upon which it concluded that the respondent had engaged in unfair labor practices within the meaning of Section 8(1) and (3) of the Act, and ordered respondent to cease and desist from the unfair labor practices in which it had engaged, and, affirmatively, to offer reinstatement with back pay to Van Delinder, less his net earnings, except from the date of the Examiner's report to the date of the Board's decision, deducting also moneys received by him during said periods for work performed upon work-relief projects. These were ordered paid over by respondent to the fiscal agencies which had supplied the funds for such work-relief. Alleged appropriate notices were ordered posted.

The principal question presented is whether there is substantial evidence to support the Board's allegation and finding of discrimination in the discharge of Van Delinder.

The respondent has been in existence and doing business in Chicago, Illinois, since May 15, 1915. During this time it has engaged in the design, manufacture, sale and distribution of cutting tools and screws. A part of its business was in interstate commerce. About one per cent of its total manufacture was for the government of the United States.

The Elgin plant was not put into operation until the early part of January, 1938. It started with one or two machines and four men, and it was about July, 1938, before a full line of machines was installed, when it went into full operating capacity with about twenty employees. Van Delinder's employment began about June 1, 1938, as shipping clerk. He worked in this department until his discharge on December 23, 1938.

Respondent contends that Van Delinder was discharged because of his persistent violation of a company rule requiring all employees to wear goggles. This rule had been in force for considerable time at the Chicago plant, where a strict compliance therewith had resulted in a radical reduction in the number of eye injuries. When the Elgin plant was opened, the same rule was introduced by superintendent Hanneman as a part of its safety program. Rule books were given each employee, including Van Delinder, and he read all the rules. A notice was posted in the plant listing penalties for violations. The penalty for failing to wear goggles was a lay off from two days to two weeks. The penalty for habitual violation of safety rules was a discharge. Van Delinder persistently violated the goggle rule. His foreman, Harper, called his attention to it, and warned him that Havlik, the general foreman, had told him (Harper) that they

[1] "Conclusions and Recommendations

"Upon the basis of the foregoing findings of fact, the undersigned hereby determines and concludes that:

"1. Respondent has not interfered with, restrained, or coerced its employees in the exercise of the rights guaranteed in Section 7 of the National Labor Relations Act, nor has it engaged in nor is it engaging in any unfair labor practice affecting commerce within the meaning of

Section 8(1) and Section 2(6) and (7) of the National Labor Relations Act.

"2. Respondent, by discharging and refusing to employ Harrison Van Delinder, as set forth in the above findings of fact has not engaged in an unfair labor practice within the meaning of the Act.

"Therefore, the undersigned recommends that the complaint be dismissed.

"Horace A. Ruckel,
"Trial Examiner."

Dated June 23, 1939.

would have to let Van Delinder go, if he insisted on not wearing goggles. Havlik saw him many times at work without goggles, and called his attention to it, and spoke to him of the necessity of it. At such times Van Delinder would put them on, but only temporarily, and finally Havlik reported him to Superintendent Hanneman, who, on several occasions had found Van Delinder working without goggles, and had warned him to put them on. About November 1, 1938, shortly before Hanneman was transferred to the Chicago plant, he found it necessary to call Van Delinder and a co-worker, Franz, "into the office and give them what I considered a final warning about the use of goggles. * * * I told them that I was getting fed up on talking to them about goggles, and I thought that Van Delinder was setting a very poor example for the other man, who was a relatively new man, and I knew that if that continued it would spread through the plant, and the time was coming when we had to make some kind of a decision on whether we were going to have 100 per cent goggle installation or whether we were going to slough off and be careless about it.

"* * * at that time, * * * we were working with a limited force there. We didn't have a big supply of extra men * * *; and laying off two men in the shipping department would probably have reduced our force by about 40 per cent, and would have cramped us very much in getting shipments out, so at that time it wouldn't be practical to lay two men off, although I did suggest that they get two weeks layoff, and modified it by saying that they could take it on Sundays."

Hanneman was succeeded by Mr. Berthelson as superintendent of the Elgin plant on November 15, 1938. A week before Van Delinder's discharge he was found at work without goggles. Thereupon Berthelson talked to him and reminded him of the several occasions when both Hanneman and Havlik had warned him to wear his goggles, and then Berthelson repeated the warning. On December 22, Havlik again found Van Delinder working without goggles and reported that fact to Berthelson, who then decided to discharge him. Having no authority to issue checks, he reported his conclusion to the Chicago office, from whence a check was sent to Berthelson for Van Delinder covering his full time up to and including December 23. It was delivered to Van Delinder at the close of the day on December 23, and he was discharged. The Examiner found that Van Delinder admitted numerous infractions of the goggle rule, including all of those concerning which he was warned by Hanneman, Havlik and Berthelson. He said in his report, "There is some evidence to show that other employees at times violated the rule. The evidence indicates that violations by others were not habitual. Van Delinder, on the other hand, was a chronic offender." On May 8, 1939, Van Delinder gave as his reason for not wearing goggles, that he had chronic ear trouble, and they hurt his ears. This was at the hearing before the Examiner.

The Board in its decision holds that Van Delinder undoubtedly violated the rule requiring that goggles be worn, but it says —"We do not believe that the respondent invoked the drastic penalty of discharge against him for that reason." This conclusion is based upon the following undisputed facts: The seventh paragraph of complaint charged that respondent by its officers and agents, while engaged in the operations at the Chicago plant, from July 5, 1935, down to and including the issuance of this complaint, employed labor spies or secret operatives for the purpose of spying upon the labor union and collective activities of its employees and reporting back to officers and agents of the company. The answer denies the truth of this statement since January 4, 1937. Not having denied the charge by answer as to the previous period, it may be considered as admitted under the rules of the Board, so far as that particular period is concerned, although respondent's answer did deny that those undenied acts had any material relation to the questions before us, or that they constitute unfair labor practices within the purview of the Act.

The record in this respect discloses that the respondent at its plant in Chicago did employ two representatives, Blair and Ekstrand, from the National Metal Trades Association, during the period from 1934 to January 4, 1937. Blair was first employed as a mechanic. Having shown executive ability, he was promoted to foremanship of the machine repair department, and later was made night superintendent. He was discharged January 3, 1937, because he fought with an intoxicated employee. Ekstrand was employed

on January 9, 1936, and was discharged on January 3 or 4, 1937, the day upon which the LaFollette Senatorial Committee published the names of these two operatives as having previously engaged in industrial espionage for parties other than respondent.

Neither Blair nor Ekstrand was in any way connected with the Elgin plant, which was not established until more than a year after they were discharged. Aside from the Board's rule as to undenied pleadings there is nothing in this record to indicate that these men were ever employed as labor spies, or that they in any way intimidated or interfered with respondent's employees in the exercise of their right to unionize. Their reports to respondent related only to such matters as safety rule violations, how the foremen were treating the employees, thefts, and any radical communistic attitude in the plant. There were no labor activities among the employees at those times, neither was there any unrest. Since January 4, 1937, no one has been employed by the respondent for espionage purposes of any kind. These facts are not denied, and the only reason given for considering respondent's previous brief relationship with Blair and Ekstrand was to establish proof of respondent's unkind feeling towards union labor, and this was attempted by virtue of a presumption of truth which counsel say is permitted to be indulged in under the rule of the Board because of failure of the pleading to deny, notwithstanding the fact that it was fully denied, and not otherwise proved, by evidence elicited by petitioner's counsel.

The facts which immediately constitute the basis of the charge of unfairness toward union labor are as follows: Ramsey, the union organizer, first came to Elgin on December 12, 1938. He talked to Van Delinder that night at the latter's home, and arranged to meet him again on December 15, at the Hotel Fox, in Elgin. On that date Van Delinder and an employee named Papay, and one or two other employees, met Ramsey. Those employees were given application cards for union membership, and a further meeting was set for December 20. The attending employees signed their applications on De-

cember 16, except Van Delinder, whose application bears the date of December 13.

On December 20, Van Delinder, Papay and a few others, met with Ramsey, and Van Delinder furnished Ramsey with a list of employees and their addresses. The name of Harper, Van Delinder's foreman, was on this list. It was agreed that Ramsey should compose a letter, calling for a meeting on January 3, and send it to each employee of the plant. This was done but the letter was not written until December 26, 1938. In the meantime, Van Delinder had been discharged on December 23. The events pertaining to unionization, up to this time, certainly were not generally known. To be sure a few of the employees who attended the meetings were aware of the program before the letters were mailed, and it is more than likely that they told other employees whom they regarded as friendly to the cause, although this was not proved, but this alone would not constitute notice to the company, nor could it form a rational basis from which notice might be inferred. The evidence is uncontradicted that no officer of the company had knowledge, before the letters were sent out, that unionization was in progress or in contemplation. The finding to the contrary does not purport to be based upon anything but inferences.

Berthelson, the superintendent, who alone had the power to hire and discharge, heard of no union activities until an employee showed him one of Ramsey's letters which had been sent out on December 26, 1938. Havlik, the general superintendent, likewise heard of it for the first time after the employees had received like letters. The same is true of Voss, foreman of the plating department.[2] Harper, Van Delinder's foreman, testified that he was told by Van Delinder about a week before he was discharged that they were organizing a union, to which Harper replied that he, Harper, could not get in if he wanted to because he was a foreman, and that Van Delinder reported to him the next day that it would be all right for him to join. He said he did not want to have anything to do with it. He further testified that he had never said a word about that conversation, or that subject,

---

[2] He was told about it and shown the letter by some of the employees the next morning after its receipt. He was then asked by one of the employees whether he was going. He replied, "Well, I don't know. Perhaps I will. I would like to know what the Machinists have to offer platers—polishers, platers and buffers."

to any of his superiors or to any one. He received one of Ramsey's letters inviting him to the meeting on January 3, but he did not attend. This record discloses that he was not considered unfriendly to the Union, and that fact is borne out by the brief filed by Ramsey on behalf of the Union before the Board in support of its exceptions to the report of the Examiner, which has been certified to us by the Board as a part of this record.[3] Furthermore, Van Delinder testified that when he first talked to Harper, Harper said "he was dissatisfied with the way things were going there and thought that they ought to have a union; that maybe conditions would be better." Certainly under these circumstances it can not be logically or rationally inferred that Harper gave information to any of his superiors prior to Van Delinder's discharge. He was the only foreman that had information on the subject prior to that time.

It is quite true that Van Delinder was rather active in securing 25 or 30 memberships. He does not testify whether these were secured before or after his discharge, and, indeed, it is not very material. Certainly this would not constitute a rational basis from which to infer that respondent must have known what he was doing, especially since he testified that he did not engage in this activity during working hours, and never in the presence of any supervisor. Whatever evidence there is on this subject indicates that he must have done considerable of this work after his discharge, because he told Harper immediately afterward that on account of his discharge he could then go to work in earnest on it. If at that time he had completed his part of the membership drive, it does not appear from the record what work he could have done. Furthermore, it is obvious from the program agreed upon at the meeting of December 20, that the real membership drive would not begin until Ramsey's letters were posted.

The meeting on January 3, 1939, was held pursuant to the letter written by Ramsey. Voss went alone to this meeting. He said that he had not been advised or directed to go by any of the respondent's officials. He was not a company official and had no authority to employ or discharge employees. He worked by the hour in actual productive work and his supervisory duties were part time only. He told persons in the hall that he was not up there for any other purpose but to find out what the machinists had to offer polishers, buffers and platers. Ramsey opened the meeting, whereupon Voss asked permission to speak and it was granted. He said, "Now, I want you to know who I am, what my job is at the Tool Works, and if there is anything that you do not want me to hear, now is the time to say so, because if you think that I am here for a purpose, why, I wish that you would just tell me to get out. Now, if there is anything said in this meeting—if you allow me in the meeting, if there is anything said in this meeting that someone on the outside, anyone, ever asks me what went on here, I'll tell the truth about it. Now, if you do not want me to hear anything under them conditions, why, I would be glad to step out."

Ramsey gave him permission to stay and he remained not to exceed forty minutes. The meeting was not ended when he left. Voss said of his meeting with foreman Havlik the next morning: "I met Havlik out in the outer shipping room, and he asked me if I was at the meeting. I says, 'Yes; I was.' And he says, 'Was there any there?' And I says, 'Franz was there.' And Franz happened to be standing there, and he said, 'Yes, I was there.' But Franz didn't attend the meeting, but he just said he was there. He was up in the hall. He was in the meeting hall. And that was all that was said then."

Upon these facts the Board found that respondent had engaged, and was then engaging, in unfair labor practices in violation of Section 8(1) of the Act. It specifies these unfair practices as interference with and restraint and coercion of its employees. It bases this part of the finding upon three separate circumstances: (1) The employment of Blair and Ekstrand in the Chicago plant, more than a year before the Elgin plant began to operate; (2) the conduct of Voss at the Union meeting of January 3, 1939, eleven days after the discharge of Van Delinder; and (3) the conversation of

---

[3] The brief states that when Ramsey first came to Elgin to organize respondent's plant, "Van Delinder let it be known that Foreman Harper was the original promoter of the idea; however, due to the fact that Harper was employed in a supervisory capacity, it would be necessary that his name not be mentioned in any drive undertaken."

Havlik, Voss and Franz on the morning of January 4, 1939.

The employment of Blair and Ekstrand is relied upon to establish an unfriendly attitude of respondent to union labor at a time more than a year prior to the act here complained of. There is not one word of evidence in this record which tends to prove that these men committed any acts of labor espionage while in the employment of respondent. True, the Board's rule permitted it, if it so chose, to consider admitted that which was not denied. However, it obviously ignored the rule at the time of the hearing before the Examiner, and attempted by its direct evidence to prove that respondent through Blair and Ekstrand was guilty of espionage. Having failed completely in this attempt, the Board even now relies upon the evidence of its own witness, elicited on cross-examination, to prove that at some other time and place, wholly unrelated to respondent or its business, Blair and Ekstrand were found, by a Senate Committee, to have practiced industrial espionage, and the Board uses this evidence in argument as a basis for inferring that Blair and Ekstrand were likewise guilty of labor espionage during the time they were in the employ of respondent. Under these circumstances we think it would be unfair at this late day to withhold from respondent the benefit of this evidence merely because of a permissive rule, which the Board did not seek to enforce until after the Examiner had heard all the evidence and had made his report. The Board still relies on the evidence thus received, which, if the rule were enforced, was clearly incompetent because immaterial, and yet it denies that benefit to respondent. Clearly the Board should not claim the benefit of both enforcement and non-enforcement and withhold reciprocal rights from respondent.

■ On the question now raised by the Board as to the character of the acts of Blair and Ekstrand while in the employ of respondent, which of course is based upon non-enforcement of the rule, we hold that their prior acts of industrial espionage as found by the Senate Committee can form no rational basis for a finding that they were performing acts of the same character for respondent.

■ On the question now raised by the Board as to the effect of respondent's admission of labor espionage during the employment of Blair and Ekstrand, we hold that admission is not of itself sufficient to constitute a rational basis for inferring that labor espionage was continued by respondent after Blair and Ekstrand were discharged The burden of proving such continued espionage since January 4, 1937, was upon the Board.

The other two circumstances, the meeting of January 3, 1939, and the conversation the next morning by Havlik, Voss and Franz, is all the other evidence upon which petitioner relies to base its finding that such espionage was practiced by respondent after January 4, 1937. Both of these events transpired eleven days after Van Delinder's discharge. The Board found that foreman Voss rightfully attended the meeting of January 3. It said, "Under the circumstances we do not view his attendance as an unfair labor practice. However, the statement Voss made after the meeting had been convened, that if permitted to remain he would disclose whatever transpired at the meeting, was clearly intimidatory. It faced the employees present with the alternative of antagonizing one of their foreman by requiring that he leave, or risking that their union activity be made known to the respondent's officials. Voss testified that he went to the meeting of his own volition and without the knowledge of the officials but when questioned about his conversation with General Foreman Havlik about the meeting he stated that 'it was general knowledge that I was there at the meeting.' Whether or not the respondent authorized or even knew the action taken by Voss, the fact is that because of his position as foreman he was looked upon by the other employees as a representative of the respondent. Voss' statement at the meeting and Havlik's action in questioning Voss concerning the meeting in the presence of Frantz were acts designed to discourage union activities."

■ Voss did not say that he would disclose whatever transpired, nor anything of equal import. He said if any one asked him any questions he would answer them truthfully. He prefaced this remark, however, with the assurance that he was there for no other purpose than to find out what the machinists had to offer him as a plater. Ramsey certainly did not think that the employees were then confronted with any embarrassing alternative, for he immediately told Voss to stay. He went there of his own volition, without knowledge of any official of respondent, and without authority from any such official, and of course, under

such circumstances, he could not bind the company by any word or act of his. The Board, however, intimates that this otherwise undenied statement as to the officials' knowledge is negatived by Voss' statement to Havlik the next morning that "it was general knowledge that I was there at the meeting." Certainly such statement alone would not bind respondent, nor override their positive statements to the contrary, and if true it would not tend to prove that he was there by order, or as a representative, of respondent.

Finally the Board said on this subject, "Whether or not the respondent authorized or even knew the action taken by Voss, the fact is that because of his position as foreman he was looked upon by the other employees as a representative of the respondent." There is not one word of testimony in this record to the effect that any employee looked upon Voss as a representative of respondent. He, in effect, told them he was not when he stated his only purpose in being there. Aside from the foreman, no employee testified except Van Delinder and Franz. No one has ever contended that Van Delinder or Franz was intimidated, restrained or coerced in his union activities by Voss' conduct or that of any one.

The Board in its brief further states that when Voss came to the meeting a number of employees left. The uncontroverted evidence is that only two persons left after Voss came. It is admitted that Franz was one of them, and Voss admits that he left before the meeting closed. If any other person left after Voss came, and before the meeting closed, no one has been able, thus far, to furnish his name. Even Van Delinder testified that Franz was the only one he recalled who left the meeting. Of course "a number of employees" would technically include any number more than one, but it is not ordinarily used to express just two.

There was nothing unlawful in the conversation on January 4th, between Havlik, Voss and Franz. Voss had told some of his fellow workmen that he would possibly go. Several of the employees had shown Ramsey's letter to Havlik, and on this occasion he merely asked Voss if he was at the meeting and who was there. Voss named a few whom he recalled, including Franz who was standing near by, just as he told Ramsey he would, if asked. Franz verified that statement as to himself, and that ended the conversation. No one claims that Havlik showed any animus against the

union, or opposed in any way the unionization of the factory, and the same is true of Voss. Neither represented respondent in what they did and said, and of course neither could bind it. Their actions, of which complaint is made, occurred eleven days after Van Delinder was discharged, and no one appears to have been restrained, coerced or intimidated in his union activities by what was done or said by Havlik or Voss.

It is very significant that, so far as this record discloses, neither respondent, nor its officers, nor its foremen ever expressed one word, or committed any act in opposition to unionization of its factory, either at Elgin or Chicago. Not an employee was discharged except Van Delinder. All are still working there, except Papay, who ceased his employment voluntarily. There is no complaint as to hours, wages or working conditions, and the only question presented is whether the Board has met its burden of proving by substantial, competent evidence that Van Delinder was discriminated against because of his union activities.

Petitioner in this respect urges that he was discriminated against because he was penalized more severely than others who were guilty of the same offense. Franz was the only employee who was at all comparable with Van Delinder in his infractions, and they worked together. Superintendent Berthelson gave a reasonable explanation of his actions in this respect. He retained the younger and better workman and the least offender, on the ground that he needed workmen, and thought that Van Delinder's discharge would stop the violations of the safety rules. This prognosis proved correct, for since the discharge there has been complete compliance with the rule. Van Delinder has never claimed that he was discharged for any reason other than failure to wear goggles. He at all times admitted his guilt in this respect and the Board found him guilty. Its conclusion that this was not the real cause of his discharge is grounded only on inferences with no factual bases, and these in turn are based on inferences of the same character, a method which has always been rejected as unsafe and unsound in the entire history of our jurisprudence.

■ We recognize with approval that Congress, in cases of this character, has relaxed the strict rules pertaining to the admission of evidence. This we understand was done for the sole purpose of expediting

364

administrative procedure, and not to limit in any manner the well-known rules relating to the weight or the applicability, or the materiality of the evidence. We think Congress presupposed that the trier of facts would weigh and apply the evidence as before and use only that which was competent and material, and disregard that which was not. The effect of the statute is to shorten trial procedure by permitting the trier, if he chooses, to admit all evidence of doubtful materiality and thus eliminate delays caused by arguments. The statute does not attempt to define competent and material evidence. That is still left to the determination of the trier. The statute merely gives him a longer time in which to make his decision, and at the same time shortens the trial. There is nothing new in this formula, for courts have used it from time immemorial in cases not triable by juries. They could always, in their findings, guard against errors in the admission of evidence, and when they did, the reviewing court would regard such errors as harmless. What was heretofore permitted by the courts has likewise been authorized by this statute in cases of this character.

■ For the reasons stated we think the cease and desist order was not warranted. On the espionage phase of the case the Board urges that respondent's discharge of labor spies more than a year prior to the filing of this charge, offers no assurance that the practice may not be carried on by the respondent's own employees, or that it may not be resumed in the future. Again the Board attempts to meet its burden of proof by relying on inference rather than facts. We are aware that offending acts ceased at the time or after the charge is made are properly enjoined, on the ground that the court may infer that the ceasing was caused by the filing of the charge. We have so held. Admitting, without conceding, that respondent had labor spies prior to January 4, 1938, we think the fact that there have been none since that time, and no threats or intimation by respondent that it would renew such practice, would not constitute a rational basis to infer that it intended to do so. Such facts would hardly be sufficient to constitute a cause of action under this Act, and we think would not warrant a cease and desist order.

■ That part of the order which directs respondent to pay to certain fiscal agencies a sum equal to the amounts which were paid to Van Delinder for labor performed upon work relief projects is not approved by us. Republic Steel Corp. v. National Labor Relations Board, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. ——.

A decree affirming and enforcing the Board's order is denied.

TREANOR, Circuit Judge (concurring in part, dissenting in part).

I concur in the holding that the Board was without authority to order respondent to pay to certain agencies a sum equal to the amounts which these agencies have paid to Van Delinder. But I am of the opinion that the order of the Board, in all other respects, was based upon findings of fact which are binding upon this Court.

It is obvious that we cannot say that the evidence conclusively required the Board to draw the inferences which it did; but I do not think that we are justified in holding that there was no evidence possessing "rational probative force" (Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 230, 59 S.Ct. 206, 217, 83 L. Ed. 126) which tended to support the Board's inferences. In such a situation, if I correctly interpret recent declarations of the Supreme Court, this Court can neither substitute its inferences for those of the Board nor disregard the Board's inferences.