**INDIANA METAL PRODUCTS CORP. v.
NATIONAL LABOR RELATIONS
BOARD.**

**No. 10717.**

United States Court of Appeals
Seventh Circuit.

March 10, 1953.

614

Edward J. Fahy and Shultz & Fahy, Rockford, Ill., for petitioner.

David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Marcel Mallet-Prevost, Atty. National Labor Relations Board, Washington, D. C., George J. Bott, Gen. Counsel and Ruth V. Reel, Attys., National Labor Relations Board, Washington, D. C., for respondent.

Before DUFFY, FINNEGAN and LINDLEY, Circuit Judges.

DUFFY, Circuit Judge.

This is a petition by the Indiana Metal Products Corporation (hereinafter called "company") to review and set aside an order of the National Labor Relations Board (hereinafter called "Board"). In its answer the Board requests the enforcement of said order. The Board's decision and order are reported in 100 N.L.R.B., No. 161.

The Board found the company violated Sec. 8 (a) (1) of the Act [1] by interfering with, restraining and coercing its employees in the exercise of their rights under Sec. 7; violated Sec. 8(a) (2) and (1) of the Act by dominating and supporting a labor organization known as the Advisory Committee; and violated Sec. 8(a) (3) and (1) of the Act by discriminatorily discharging employee Howard Meyer because of his un-

1. National Labor Relations Act, Sec. 1 et seq., as amended by the Labor Management Relations Act, 1947, 61 Stat. 136, 29 U.S.C.Supp. V, Sec. 151 et seq., 29 U.S.C.A. § 151 et seq.

ion membership and activity. The Board ordered the company to immediately reinstate Meyer, to make him financially whole, and to withdraw and withhold all recognition from and completely disestablish the Advisory Committee.

The company employed about 60 people and manufactured screws and metal stampings at its only plant located about 4½ miles from Rochester, Indiana, a city having a population of approximately 4,600 people. N. F. Schroeder was the general manager of the company.

Meyer was employed by the company in 1948, and worked in the tool room as a machinist and Class B tool maker. Although Meyer had little or no experience in this line of work when first employed, he learned it rapidly. In December, 1948, Meyer requested a wage increase and when this was refused unless he agreed to work on the night shift, he determined to quit. However, upon the urging of General Manager Schroeder that he think it over, he reconsidered and went back to his job at the rate of pay he had been receiving.

There was testimony that in December, 1948, Meyer had trouble with the superintendent, the foreman, and the master-mechanic, and they decided to "let him go." However, Schroeder, who had taken a liking to Meyer, intervened and saved his job. Later Foreman Babarik complained of Meyer's work and asked Foreman Howton not to let Meyer do work for his department.

On April 22, 1950, Meyer and employee John Sanders were separated from their employment with the company. On that day, at about 3:15 P. M., Plant Superintendent Bietz "pulled" Sanders' card from the time card rack. Meyer noticed this and walked over to the rack to ascertain whose card had been pulled. He then walked back past his own bench some 25 feet to 30 feet, and talked with employee Peterson.[2] This conduct was observed by his foreman, Howton. It appears that at least on one previous occasion when another card had been pulled from the rack Meyer had inspected the rack and thereafter visited with a workman.

Foreman Howton complained of Meyer's conduct to Superintendent Bietz, stating he desired to discharge Meyer. Howton and Bietz then conferred with Manager Schroeder, who acquiesced in their joint request. By this time Meyer had left the shop and did not know until he reported for work on Monday morning, April 24, that his card had been pulled. On that day Meyer and Sanders met with Manager Schroeder and asked him why their cards had been pulled. Schroeder told Sanders he had been discharged for absenteeism. He gave as the reasons for Meyer's discharge, dissatisfaction with his job, not taking an interest in his work, and causing too much trouble in the plant among the employees.[3] As the conversation was concluded, Meyer remarked, "I think I should have had a warning." At the conference nothing was said by anyone with reference to the union or union activities.

On May 2, 1950, the union[4] filed its charge that the company violated Secs. 8 (a) (1) and 8(a) (3) by the discharge of Sanders and Meyer. The Board found that the separation of Sanders from his employment was not a discriminatory discharge, but found that Meyer was discharged because of his support and activity upon behalf of the union. We shall therefore consider first whether, on the record as a whole, there is substantial evidence to sus-

2. There was considerable testimony that Meyer talked to other employees. The trial examiner however found that he talked "with no more than a very few employees, taking no more than a few minutes."

3. On the same day, in reporting the Meyer discharge to the Indiana Employment Security Division, Schroeder reported, "This employee was asked to leave to enable him to find a position more to his liking. He was dissatisfied with us and over a long period attempted to discourage his fellow workers. He also made everyone's business his affair resulting in lost time and unnecessary shop gossip."

4. International Union, United Automobile, Aircraft and Agricultural Implement Workers of America, CIO.

616

tain the Board's finding as to Meyer's discharge.

About the first of April, 1950, employee Sanders contacted a representative of the union. Thereafter, on the evening of April 8, 1950, which was two weeks prior to the date of Meyer's discharge, Sanders, Peterson, Dorson and Meyer, all employees of the company, met with two union organizers at the Farm Bureau Hall at Rochester. Meyer and the three other employees each signed a union application card. A week later, at the same place, a second meeting was held which was attended by 8 or 10 employees, including Meyer. A third meeting, attended by 12 or 14 employees, was held on the evening of the day Sanders and Meyer were discharged.

On a number of evenings after April 8, Meyer, usually accompanied by Peterson, visited various employees at their respective homes, soliciting union membership. Also during lunch hours he spoke to employees about the union, while seated in their automobiles either in the parking lot or while driving to or from Rochester. Meyer testified that his organizational activities were very quiet. He also testified as follows:

"Q. Did you ever discuss the union at the plant? A. Very little.

"Q. Did you sign up any employees at or around the plant? A. No, sir."

To prove that management was aware of Meyer's activities upon behalf of the union, the Board largely relied on an incident occurring April 8. Sanders, upon returning from the meeting hereinbefore mentioned, saw Foreman Dorsett and his wife sitting at a table in a restaurant. Sanders tossed onto Dorsett's table a pad of matches on which union advertising was printed, including the slogan, "Join UAW-CIO," and said something to Dorsett about joining a good union. Dorsett is reported as saying, "Oh, brother," or "Oh, my God." Dorsett testified that he did not consider the incident of any significance and related it to no-one.

 It is clear that the record discloses nothing that happened prior to the date of

Meyer's discharge which would sustain the Board's findings that it was his activity upon behalf of the union which was the cause of his discharge. The burden was on the General Counsel of the Board to prove affirmatively, by substantial evidence, that Meyer's discharge was due to union activities. N. L. R. B. v. Reynolds International Pen Co., 7 Cir., 162 F.2d 680, 690; Interlake Iron Corp. v. N. L. R. B., 7 Cir., 131 F.2d 129, 134. In the latter case, this court, in an opinion by Judge Minton, said, "The company does not have to prove nondiscrimination because of union activities. The Board must prove discrimination because thereof. This burden of the Board to prove discrimination and to prove that discrimination was employed in the hiring or firing of a man because of his union activities does not shift from the Board. [Citing.]"

In order to find that the company knew of the union activity, that Meyer was engaged in it, and that he was fired because of it, the Board drew an inference that because the factory was located near a relatively small town the company must have become aware of such union activity as a matter of common knowledge, even though such activity was carried on very quietly, and further, that in some manner the company officials must have learned of Meyer's organizational efforts in behalf of the union. Based on these inferences, the Board found he was fired for union activities. However, it is well established that inference piled on inference is not a substitute for evidence. Interlake Iron Corp. v. N. L. R. B., supra, 131 F.2d at page 133; N. L. R. B. v. Illinois Tool Works, 7 Cir., 119 F.2d 356, 364.

The Board however also relies upon two incidents which occurred after the date of Meyer's discharge. Employee Sheetz testified that on April 24, her foreman, Richard Roe, said to her, "You didn't sign any union card, did you?" to which she answered, "No," and he said, "Well, that is good, because there are 50 people that did and they are all going to get fired." The other incident relied on occurred sometime after the middle of May, 1950. Employee

Gilliland testified that foreman Lewis said to him that "if I joined a union or signed any papers, my days would be numbered."

On April 26, four days after Meyer's discharge, the union wrote to the company, claiming a representative status. As far as the record discloses this was the first information Manager Schroeder or any company officer had of any union activities at the plant. On May 2 he received a copy of the union's charges. On the days when he received the union letter as well as the copy of the charge he called all of the foremen into the office, told them of the receipt of the respective documents, and instructed them not to threaten, intimidate or coerce any employee for any union activity.

The Board's decision states, "Like the trial examiner, we are not convinced by the explanation offered by the respondent for Meyer's discharge." The Board's approach seems to be that the burden of proof was upon the company. Of course an employer may discharge an employee for many reasons so long as such action is not taken because of union activities of such employee. In N. L. R. B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 57 S.Ct. 615, 81 L.Ed. 893, the court pointed out that the Act does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them. In N. L. R. B. v. Montgomery-Ward & Co., Inc., 8 Cir., 157 F.2d 486, 490, the court said, "In considering the propriety of these discharges the question is not whether they were merited or unmerited, just or unjust, nor whether as disciplinary measures they were mild or drastic. These are matters to be determined by the management, the jurisdiction of the Board being limited to whether or not the discharges were for union activities or affiliations of the employees."

■ The Board also lays emphasis upon the "timing" of the discharge, linking it to the date when certain union activities occurred. However, we think the statement of the court in N. L. R. B. v. Citizens-News Co., 9 Cir., 134 F.2d 970, 974, is applicable: "The fact that a discharged employee may be engaged in labor union activities at the time of his discharge, taken alone, is no evidence at all of a discharge as the result of such activities. There must be more than this to constitute substantial evidence."

■ Manager Schroeder wrote three letters to each employee, under dates of May 26, August 15, and August 23. In each letter he advanced arguments as to why the employees should not vote in favor of union representation. But each letter also clearly pointed out that the employee was free to join or not to join a labor movement. Apparently the Board considered these letters as evidence to show that Meyer was discharged because of union activity, although admittedly such letters did not contain any threat of reprisal or force or promise of benefit. Under the circumstances, we think the statute forbids the use of these letters as evidence. Sec. 8(c) of the Act, as amended, 29 U.S.C.A. § 158 (c), reads: "The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit. In Pittsburgh S. S. Co. v. N. L. R. B., 6 Cir., 180 F.2d 731, 735, affirmed 340 U.S. 498, 71 S.Ct. 453, 95 L.Ed. 479, the Court of Appeals, under a somewhat similar factual situation, stated, "With reference to the right of free speech the legislative history shows that the amendment embodied in § 8(c) of the Taft-Hartley Act was specifically intended to prevent the Board from using unrelated non-coercive expressions of opinion on union matters as evidence of a general course of unfair labor conduct."

There is a striking resemblance between the facts in the case at bar and those considered by this court in N. L. R. B. v. Illinois Tool Works, 119 F.2d 356. In both cases the discharge of an employee who had been active in union organization work was at issue. In both cases small plants were involved. In the Illinois Tool case one of the employees met with the union organizer on December 12, 1938. Three

days later the employee and one or two others met with the organizer at a downtown hotel. On December 20 a larger group including the employee met the organizer, and it was there determined that the organizer would write a letter to all employees. The employee was discharged December 23, 1938. The employee had been active and had signed up 25 or 30 employees for the union. We stated, 119 F. 2d at page 360, "The events pertaining to unionization, up to this time, certainly were not generally known. To be sure a few of the employees who attended the meetings were aware of the program before the letters were mailed, and it is more than likely that they told other employees whom they regarded as friendly to the cause, although this was not proved, but this alone would not constitute notice to the company, nor could it form a rational basis from which notice might be inferred. The evidence is uncontradicted that no officer of the company had knowledge, before the letters were sent out, that unionization was in progress or in contemplation. The finding to the contrary does not purport to be based upon anything but inferences." In the Illinois Tool case the employee, a week before his discharge, told his own foreman about the organization of the union at the plant, and invited him to join. The foreman testified that he never said a word about this conversation or the subject to anyone. Here, as there, we can find no reason to discredit the sworn statement of the foreman.

 The employees who were most active upon behalf of the union were Sanders, Meyer, Peterson and Dorson. Meyer and Peterson worked as a team, on several nights, in visiting homes of employees. But Peterson and Dorson were not discharged. At the time of the hearing, they were still employed by the company and had, in fact, received promotions. The Board held that Sanders' separation from his employment was justified. There is no basis in this record to justify the finding that Meyer was discharged because of his union activities except by employing the device of laying inference upon inference. We conclude that considering the record as a whole, there is no substantial evidence to sustain the Board's findings that Meyer was discharged because of his union activities. It follows that the portion of the Board's order requiring his reinstatement with back pay will not be enforced.

The original charge of unfair labor practices was filed by the union on May 2, 1950. The election was held on August 23, 1950, resulting in a tie vote. Both the company and the union filed timely objections, and a second election was ordered, but has not been held. The amended charge was filed December 29, 1950.

The original charge alleged the company was engaged in unfair labor practices in violation of Secs. 8(a) (1) and (3) of the Act, by the discharge of employees Sanders, Meyer and Hentzler because of activities upon behalf of the union. Then followed the language: "By the acts set forth in the paragraph above and by other acts and statements, it, by its officers, agents and employees, interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in Section 7 of the Act." The amended charge claimed violations of Sec. 8(a) (1), (2) and (3) of the Act. The union dropped its complaint as to the discharge of employee Hentzler, but the amended charge contained the following additional allegation, "It, by its officers, agents, and employees, on or about October 2, 1950, and since that date, dominated and interfered with the formation and administration of a labor organization, known as the Advisory Committee, and has contributed financial and other support to it." The language hereinbefore quoted as to the violation of Sec. 7 of the Act followed.

The complaint herein was issued May 11, 1951. In Paragraph 6 it was alleged that on April 24, 1950, foreman Roe questioned an employee about her union activity and threatened her with loss of her job if she continued such activity, and that on April 26, 1950, a supervisory employee, Lewis, in like manner questioned and threatened another employee. It was also alleged that about July 23, 1950, the company announced and granted benefits to its employees in the form of paid holidays and a group insurance program.

■ The company complains that the very general language in the original and amended charges was not sufficient to put it upon notice as to just what grievances the union claimed. It must be conceded that except for the statements in each charge as to the alleged discriminatory discharges of employees, and the allegations in the amended charge as to the Advisory Committee, there were no specific acts or practices of the company which were described. However, the charge is not a pleading. We so held in N. L. R. B. v. Bradley Washfountain Co., 7 Cir., 192 F.2d 144, 149. Courts have not hesitated to sustain allegations in Board complaints which were considerably wider in scope than the language contained in the charge. N. L. R. B. v. Kobritz, 1 Cir., 193 F.2d 8, 15; N. L. R. B. v. Kingston Cake Co., 3 Cir., 191 F.2d 563, 567. In the Bradley opinion we said, 192 F.2d at page 149: "Consequently it is without significance that the complaint was broader than the original charge." Basing the complaint upon broad allegations in the charge may well, at times, be unfair to an employer, but such interpretation is required by the broad language of Sec. 10 (b): "Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board * * * shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect * * *." However, one limitation has been adhered to. The Board is barred under Sec. 10(b) of the Act from enlarging or adding to the language of the charge so as to include unfair labor practices committed more than six months prior to the filing and serving of the charge. N. L. R. B. v. Globe Wireless, Ltd., 9 Cir., 193 F. 2d 748, 752; Joanna Cotton Mills Co. v. N. L. R. B., 4 Cir., 176 F.2d 749, 754.

At the hearing the company moved to strike Paragraph 6 of the complaint, claiming among other things that the allegations of said paragraph came within the prohibition of Sec. 10(b) of the Act which provided, " * * * Provided, That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made * * *." The motion to strike was denied.

■ The Board found the company in violation of Sec. 8(a) (1) of the Act in that it interfered with, restrained, and coerced its employees in the exercise of their rights guaranteed by Sec. 7, by foreman Roe's interrogation of and warning to employee Sheetz, by foreman Lewis' threat to employee Gilliland, and by granting its employees paid holidays and insurance benefits as inducements to reject the union.

The testimony disclosed and the Board so found that the date of the conversation between foreman Lewis and employee Gilliland was after the middle of May, 1950. The Board also found that the date when the company announced its policy as to paid holidays was on June 20, 1950. Thus, each event was subsequent to the filing and the serving of the first charge and more than six months prior to the filing and serving of the amended charge. We hold that the Board was not warranted in basing a finding of unfair labor practice upon either of these occurrences.

Therefore, there remains for consideration the interrogation and alleged threats of foreman Roe on April 24, 1950, the company's insurance program announced on July 25, 1950, and the formation of the Advisory Committee announced by the company on October 2, 1950.

■ There is substantial evidence in the record to sustain the finding that foreman Roe asked employee Sheetz whether she signed a union card, and that when she replied in the negative he said, "Well, that is good, because there are 50 people that did and they are all going to get fired." The testimony reveals that this occurred prior to the time that manager Schroeder learned of union activities at the plant, and prior to the time when, upon receipt of the notice by the union of its claimed representative status, he warned the foremen not to attempt to influence the employees or threaten or coerce any of them for union activity. However, under the circumstances, the company is responsible for the foreman's

act of interference. H. J. Heinz v. N. L. R. B., 311 U.S. 514, 519–521, 61 S.Ct. 320, 85 L.Ed. 309. We hold such interrogation and threat was in violation of the Act. N. L. R. B. v. Illinois Tool Works, 7 Cir., 153 F.2d 811, 814; N. L. R. B. v. LaSalle Steel Co., 7 Cir., 178 F.2d 829, 833, certiorari denied 339 U.S. 963, 70 S.Ct. 996, 94 L.Ed. 1372; N. L. R. B. v. Superior Tanning Co., 7 Cir., 117 F.2d 881, 887–888, certiorari denied 313 U.S. 559, 61 S.Ct. 834, 85 L.Ed. 1520.

The insurance program was announced on July 25, 1950. The company posted a notice that it had signed a contract with an insurance company covering employees and their dependents with extensive insurance. In a follow-up letter sent to the home of each employee the company stated that it would assume 50% of the actual cost of the insurance premiums, as well as the cost of administration, collection and accounting.

In the literature which the union distributed among the employees, it listed insurance benefits paid for by the employer among the benefits which the union had achieved in other plants. Where economic benefits are instituted for the purpose of thwarting self-organization, the courts have held same to be an unlawful interference. Medo Photo Supply Corp v. N. L. R. B., 321 U.S. 678, 686, 64 S.Ct 830, 88 L.Ed. 1007; Joy Silk Mills, Inc., v. N. L. R. B., 87 U.S.App.D.C. 360, 185 F.2d 732, 739; N. L. R. B. v. Kropp Forge Co., 7 Cir., 178 F.2d 822, 828. The Board found unlawful interference and there is substantial evidence in the record to sustain such finding.

The company argues that no strings were attached to the offer and no threats to withdraw the benefits if the employees persisted in supporting the union, but such considerations are by no means controlling. In view of one of Schroeder's letters, the Board had a sufficient basis for its finding that arranging for insurance covering its employees constituted an unlawful interference by the company to the right of self-organization. As the court stated in May Dept. Stores Co. v. N. L. R. B., 326 U.S. 376, 385, 66 S.Ct. 203, 209, 90 L.Ed. 145, "It interferes with the right of self-organization by emphasizing to the employees that there is no necessity for a collective bargaining agent."

We consider next the Advisory Committee. After August 2, 1950, several employees approached manager Schroeder, suggesting the possibility of a committee of employees to discuss various employee problems with him. On October 2, by a notice posted on the plant bulletin board, Schroeder notified the employees that an election would be held among them for the purpose of selecting an Advisory Committee, to consist of an employee representative from each department in the plant. Thereafter nine departmental representatives were selected. This committee and Schroeder met for the first time on October 20, and the committee members were then informed that they were "at liberty to discuss anything they wanted in any form, shape or manner." Thereafter meetings were held at regular intervals and a wide variety of subjects affecting the employees' wages, hours and conditions of employment were considered. The meetings were held on company time and on company premises. There is here no denial of the company's domination. Therefore, if the Advisory Committee was a labor organization under the definition in Sec. 2(5) of the Act, the company's domination of it clearly constituted a violation of Sec. 8(a) (1) and (2). N. L. R. B. v. Southern Bell Telephone & Telegraph Co., 319 U.S. 50, 55, 63 S.Ct. 905, 87 L.Ed. 1250; N. L. R. B. v. Bryan Mfg. Co, 7 Cir., 196 F.2d 477. The Board so found.

The company urges that the Advisory Committee was not a labor organization within the meaning of Sec. 2(5) of the Act, pointing out that the committee had no officers, constitution, by-laws, dues or treasury, and that it was not recognized as the representative of the employees for collective bargaining purposes. The company insists that the committee did not "deal" with the employer.

Sec. 2(5) of the Act defines the term "labor organization" to include "any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which

exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." The legislative history [5] shows that the definition of the term "labor organization" was purposely phrased very broadly.

Manager Schroeder's initial notice stated that the Advisory Committee was for the purpose of discussing "grievances, seniority, promotions, insurance, employee welfare," and "working conditions." It is without dispute that representatives of the employees met from time to time with company officials and discussed questions affecting wages, hours of employment and working conditions. The minutes of the meetings of the Advisory Committee show that recommendations made by the committee were frequently carried out or agreed to by the management.

A claim by the company, quite similar to the one made here, that a "junior board" did not "deal with" or "bargain with" management was rejected in N. L. R. B. v. Jas. H. Matthews & Co., 3 Cir., 156 F.2d 706, 707–708. Also, the fact that the Advisory Committee had no formal organization does not prevent it from falling under the definition of a labor organization in the Act. This court has recognized that "Such loosely-formed committees * * * constitute labor organizations within the meaning of the Act." N. L. R. B. v. American Furnace Co., 7 Cir., 158 F.2d 376, 378.

There is substantial evidence in the record taken as a whole to sustain the Board's finding that the Advisory Committee was established to provide the employees with a substitute for a bona fide collective bargaining representative, and that in practice the committee has functioned as a vehicle for the discussion, consideration and improvement of working conditions. Also, the Board's finding that the company's domination of the committee violated Sec. 8(a) (1) and (2) must likewise be sustained.

The company protests the order of the Board that it withhold all recognition from and completely disestablish the Advisory Committee, pointing out that many benefits have resulted from the across-the-table discussions. The company insists that it is "good, sound employer-employee relations in action." Undoubtedly it is true that many benefits have resulted to the employees due to the functioning of the Advisory Committee. However, it is well settled that it is for the Board to determine what remedial measures are best suited to neutralize the unfair labor practices that have occurred. Franks Bros. Co. v. N. L. R. B., 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020; N. L. R. B. v. LaSalle Steel Co., 7 Cir., 178 F.2d 829, 835.

The Board's order, to be modified consistent with this opinion, will be enforced.

---

5. Rep.No.573, on S. 1958, 74th Cong., 1st Sess., p. 7.