## NATIONAL LABOR RELATIONS BOARD
### v.
## CLEVELAND TRUST CO.
### No. 11966.

United States Court of Appeals,
Sixth Circuit.

May 27, 1954.

Frederick U. Reel, Washington, D. C., George J. Bott, David P. Findling, A. Norman Somers, Frederick U. Reel, Jean Engstrom, Washington, D. C., on brief for petitioner.

Welles K. Stanley, Carl H. Clark, Stanley, Smoyer & Schwartz, Cleveland, Ohio, Hawley E. Stark, Douglas, Stark, Jett & Biechele, Cleveland, Ohio, for respondent.

Before SIMONS, Chief Judge, and ALLEN and MILLER, Circuit Judges.

ALLEN, Circuit Judge.

This petition to enforce an order of the National Labor Relations Board arises out of a complaint charging that the respondent violated the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., in the alleged discriminatory discharge of employee William Sorger, in the granting of wage increases and increased vacations with pay to the employees for the purpose of discouraging membership and activities on behalf of the union, and that it interrogated employees concerning their union affiliation and memberships and warned them to refrain from becoming members of the union. The trial examiner found that the discharge of Sorger was for cause without knowledge of Sorger's activities on behalf of the union and was not discriminatory. The Board concurred in this ruling but held that upon the other charges the respondent had been guilty of unfair labor practices and issued the usual cease and desist orders.

Respondent gave its employees two wage increases, one on November 21, 1950, and one on April 1, 1951. The union drive for membership was begun in the fall of 1950 and open organization meetings were held on October 19th and November 2nd in Cleveland, Ohio.

The trial examiner found that, because of a sudden turnover in employment in the area, the raising of wages by other employers in competing banks, the inflationary trend in the national economy, the rise in income tax rates, plus the threat of a wage freeze, the respondent did not by granting the increase of November 21, 1950, violate the Act.[1] This finding was not sustained by the Board,

---

1. Each of the wage increases was made against the background of the situation created by the entrance of the United States into the Korean War, the enactment of the Defense Production Act of 1950 on September 8, 1950, and the executive measures taken pursuant to that enactment. The Defense Production Act, 64 Stat. 803, § 401, 50 U.S.C.A.Appendix, § 2101, declares that the purpose of the

which held the increase to be an unfair labor practice because it was announced in a letter which expressed hostility to the union.

The sending of the letter by respondent to its employees, dated November 21, 1950, which announced a salary increase effective November 15, 1950, came about as follows: When the union began to organize its campaign, some of the bank's employees asked their supervisors for information concerning the union. These inquiries were referred to management and the president of the bank gave an extended talk to the supervisors. A copy of this talk was mailed to each employee November 21, 1950. The statements of fact made in this letter are not controverted. Both the examiner and the Board found that it contained no coercive or illegal statements and was protected by Section 8(c). In substance the supervisors were instructed as follows: The employees have a right to join a union and to convince others to join so long as the campaign is carried on during non-working time. Employees have an equal right to refuse to join the union and to convince others that they should not join; if they have joined they have a right to withdraw. The anti-union campaign must also be carried on in non-working time. Representatives of management can neither threaten nor intimidate employees in the making of their choice, nor promise a benefit. Management representatives must refrain from interrogat-

enactment is "to stabilize the cost of living for workers and other consumers * * * to protect * * * wage earners, * * * and persons with relatively fixed or limited incomes from undue impairment of their living standards * * *." Under § 402(b) (1) the President was authorized to issue regulations and orders "stabilizing wages, salaries, and other compensation" in accordance with the provisions of the subsection and under § 402(c) the President was authorized in stabilizing and adjusting wages, salaries, or other compensation to "make such adjustments as he deems necessary to prevent or correct hardships or inequities." Under § 702(e) the words "wages, salaries, and other compensation" were defined to include "all forms of remuneration to employees by their employers for personal services, including, but not limited to, vacation and holiday payments * * *." 50 U.S.C.A. Appendix, § 2152(e). Pursuant to this statute Executive Order No. 10161, 50 U.S.C.A.Appendix, § 2071 note, U. S. Code Congressional Service, 81st Congress, Second Session, 1950, page 1638, was executed by the President on September 12, 1950, creating the Economic Stabilization Agency headed by an Administrator with power to "Establish price ceilings and stabilize wages and salaries where necessary", § 402. In § 403(b) the Wage Stabilization Board was authorized to make recommendations to the Administrator regarding the planning and development of wage stabilization policies and to perform such further functions with respect to wage stabilization as might be determined by the Administrator after consultation with the Board. In accordance with the statute and the Executive Order, General Wage Stabilization Regulation 1, January 26, 1951, provided that "No employer shall pay any employee and no employee shall receive 'wages, salaries and other compensation' at a rate in excess of the rate at which such employee was compensated on January 25, 1951, without the prior approval or authorization of the Wage Stabilization Board." In General Regulation 6, approved February 27, 1951, the Wage Stabilization Board pointed out: that in the spring of 1950 business conditions improved and both wages and the cost of living commenced to rise; that the outbreak of the Korean War accentuated these developments; that disparities developed in various industries between increases in wage and salary rates and increases in the cost of living; and that these disparities were frozen as a result of the issuance of General Wage Stabilization Regulation No. 1, January 26, 1951 (quoted above). In order to deal with this inequity the Wage Stabilization Board declared: "If general increases in wage and salary levels in an appropriate employee unit have been less than ten (10) percent since the base pay period, future increases in wages, salaries, and other compensation may be permitted in amounts up to but not in excess of the difference between such past increases, if any, and the permissible ten (10) percent." (General Regulation 6).

ing employees regarding union activities and must not ask any employee if he has joined a union or attended union meetings, if he knows who has joined, and if he knows who has attended a meeting.

The letter called attention to benefits enjoyed by the employees, such as group life and accident insurance carried without cost to employees and the pension plan for employees which had been in effect for many years. It also stated that employees with over 19 years' tenure would receive a three weeks' annual vacation with pay instead of the two weeks' paid vacation theretofore granted. Under Section 702(e) of the Defense Production Act of 1950 this increase in vacations with pay was included in the phrase "wages, salaries, and other compensation", 64 Stat. 816, authorized to be stabilized or frozen. If the increase in vacation periods had not been granted prior to the issuance of the freeze order, January 26, 1951, which was expected to be made shortly, the increase in vacations could not have been given without the prior approval of the Wage Stabilization Board.

The reason for the salary increase was stated in the letter to be the recent increase in the cost of living, the increase in the federal income tax, and the possibility of a threatened wage freeze in the immediate future. The vacation increase for the employees with 19 years' service had been discussed for a number of years. Similar increases had recently been made by other banks. 384 out of 1900 employees of respondent were eligible for this three weeks' vacation. This explanation given fully in respondent's answer was not controverted in the evidence. Counsel for the Board in open court stated that he did not question the truth of respondent's statements in its literature. The Board offered no testimony and respondent's explanation of its reasons for the salary and vacation increases is undisputed.

The Board set aside the finding of the trial examiner that the increase of salaries put into effect November 21, 1950, did not constitute a violation of the Act.

The Board ruled that, since the wage increase was announced in the letter described above and about six weeks in advance of the regularly scheduled review of wages, this increase was intended and calculated to influence the employees to reject the union as their collective bargaining representative. The question, therefore, is squarely posed whether, in view of Section 8(c), it is a violation of the Act for an employer, in a non-coercive letter expressing opposition to the union, to call the employees' attention to benefits already enjoyed by the employees, such as insurance without cost to the employees, pension plans, a change in vacation benefits already determined, a general wage increase already made, granted outside of the usual schedule, the date being advanced admittedly because of competitive pressure from similar organizations, conceded sharp increases in the cost of living and action of the Wage Stabilization Board.

■ The finding that the announcement of the advancement of increases in salaries to November 21, 1950, was made in order to encourage opposition to the union and violates the Act, ignores various emphatic circumstances. The explanation of the increase made by the respondent has never been denied. The Board is not authorized to ignore material uncontradicted facts. It is required under Section 7(c) of the Administrative Procedure Act, 5 U.S.C.A. § 1006(c), to impose no sanction or rule or order or issue any rule or order "except upon consideration of the whole record * * * and as supported by and in accordance with the reliable, probative, and substantial evidence."

■■ Moreover, the letter itself is a written statement and Section 8(c) protects any and all statements made by employers which contain no threat of reprisal or force or promise of benefit. The letter was found by both the examiner and the Board to be protected by 8(c), in other words, to contain neither promises nor threats. As to the increase of November 21, 1950, the trial examiner who heard the witnesses stated that the

testimony of Kingsbury, respondent's personnel director, and the principal witness as to the increases, was credible and uncontroverted. The proposition for this particular increase was made in the late summer of 1950, when Kingsbury learned from personnel officers of two competing banks that they planned salary increases. In August, 1950, Kingsbury discussed with the bank's president the advisability of taking similar action and recommended it. This was several weeks prior to the first organization meeting of the union (September 21, 1950) and prior to any knowledge on Kingsbury's part of union activities. On October 5, prior to the union's first open meeting (October 19, 1950), Kingsbury renewed this proposition with the bank's president. The probability of the increase was announced to a group of the bank's branch managers on October 11 and the usual meetings to arrange the details of the increase with the branch managers and department heads followed. The fact that this increase was planned and approved before the union began its open organization campaign is uncontradicted. The fact that it was announced in a statement in which the bank expressed opposition to the union does not make the increase an unfair labor practice. It is not a promise of future economic benefit when an employer recounts that an increase in salary has already been made, nor is it a violation of the Act to announce it. An employer is entitled, in absence of coercion or promise of benefit, to recount the beneficial effects of the relationship with his employees. This is part of freedom of speech and upon this point the order of the Board cannot be enforced.

As to the vacation increases, it is not disputed that they were made under the threat of wage stabilization, which was ordered in January, 1951, and that they were a part of the picture of inflationary inequities operating upon these employees with fixed salaries intended to be covered by the provisions for wage stabilization. There is no evidence in the record that the vacation increases were determined in order to influence employees to vote against the union.

The increase of April 1, 1951, also held invalid, was not announced in advance. No evidence was adduced controverting respondents sworn statement that this wage increase was made to correct inequities created by the increase in the cost of living. The Wage Stabilization Board in its General Order No. 6 issued February 27, 1951, had declared that a 10% salary increase was necessary "to correct such inequities as have arisen because of disparities between increases in wages and salaries and the increase in the cost of living since January 15, 1950." From June 15, 1950, to October 15, 1950, the cost of living as shown by the United States Bureau of Labor Statistics, Cost of Living Index, increased by 4.6 points. From October 15, 1950, to February 15, 1951, the Cost of Living Index increased by 9.6 points. The aggregate amount of respondent's November 15th and April 1st increases did not exceed the 10% increase found necessary by the Wage Stabilization Board to correct these inequities. While the April 1st increase was made after the union had filed its petition for representation, it was before the union had established that it had the necessary number of cards to demand the holding of an election. The election was a consent election and the second increase was made four weeks before the union and the bank agreed to the election and seven weeks before the election. We think the finding that the second increase constitutes an unfair labor practice is not based upon the record considered as a whole and arises out of an erroneous conception of the applicable law. The trial examiner stated that the explanation regarding the second increase is "not convincing." The Board adopted this finding. But the burden of proof rests not upon the bank to convince the Board that the raise was not in violation of the Act but upon the Board to prove that the raise was illegal. N. L. R. B. v. Asheville Hosiery Co., 4 Cir., 108 F.2d 288;

Martel Mills Corp. v. N. L. R. B., 4 Cir., 114 F.2d 624; N. L. R. B. v. Illinois Tool Works, 7 Cir., 119 F.2d 356; Indiana Metal Products Corp. v. N. L. R. B., 7 Cir., 202 F.2d 613; Cupples Co. Manufacturers v. N. L. R. B., 8 Cir., 106 F.2d 100; Law v. N. L. R. B., 10 Cir., 192 F.2d 236.

■ The Board considered that, since the bank in the middle of May mailed out the non-coercive letters of various employees opposing the union, an inference was raised that its salary increase made on April 1st was for an unlawful purpose. But the uncontradicted testimony as to the reason for this increase, which was the same as for the increase of November 21st, forbids such an inference. On the record considered as a whole, the bank made these increases for exactly the reason stated in the respondent's sworn answer and in respondent's testimony, much of which the trial examiner found to be uncontradicted and credible. None of the testimony was found to be false. Moreover, the employer was not compelled to ignore the inequity created by high living costs and recognized by a national official board. Such a principle would mean that it is the duty of the employer to refrain from benefitting his employees in order to make them more inclined to vote for a union. A similar holding was made in N. L. R. B. v. W. T. Grant Co., 4 Cir., 208 F.2d 710, 712. The court decided that an increase in wages between the date of hearing and the date of the election was not made to discourage union membership and did not amount to an unfair labor practice. As the court pointed out:

"Certainly it cannot be laid down as a governing rule that during a union campaign, management must deny to its employees increased advantages which in the absence of the campaign would be granted. It should be noted that in this case there was no certified union with which the employer could bargain and therefore the case does not fall within the ruling that an employer should not grant an increase of wages without notice to a duly appointed bargaining agent, since such action minimizes the influence of organized bargaining."

The court held that the Board's conclusion that the purpose and effect of the wage increase was unlawful and unfair is based only on an inference too tenuous to support its order. Cf. Peter J. Schweitzer, Inc., v. N. L. R. B., 79 U.S. App.D.C. 178, 144 F.2d 520, 524; N. L. R. B. v. Bailey Co., 6 Cir., 180 F.2d 278, decided by this court, presents a different factual situation and is not controlling here. In that case the employer was not confronted with the situation created by the Korean crisis, the inflation, the Defense Production Act, a wage freeze order of the Wage Stabilization Board, and the further order permitting an increase of wages in order to correct these inequities. The decision of the Board with reference to the increases of November 15, 1950, and April 1, 1951, is set aside.

■ The finding and decision of the Board that the respondent committed an unfair labor practice by paying for the mimeographing and distribution of letters at the request of employees who opposed union representation cannot be sustained. Three letters drawn up by employees were mimeographed and mailed by the bank at the request of the employees. Two of these were framed by the so-called "Employees' Committee" headed by Wayne Moffitt. The trial examiner found that the Employees' Committee was a labor organization, but the Board reversed this finding. The Committee clearly was not a labor organization for the uncontradicted testimony shows that it was formed for the sole purpose of opposing unionization, that it worked to that single end, and was disbanded after the election. Hence, the respondent's dealings with the Committee, which were initiated by the employees themselves, do not constitute domination of or interference with the formation or administration of any labor organization or contribution of finan-

cial or other support to it, which under Section 8(a) (2) is declared to be an unfair labor practice.

■ The third letter was drafted by an employee of the Real Estate Loan Department and signed by numerous men and women in his department. It is uncontradicted that the proposition of taking action about the coming election and of mailing the letters emanated from the employees themselves. The only suggestions of respondent's attorney with reference to the form of the letters were that three statements critical of union sympathizers be deleted from the letters of the Employees' Committee. The total expense of mimeographing and distributing amounted to $468.24. The union conceded at the hearing that it had spent at least an equal amount on mailing to the employees various union newspapers or literature during the entire seven months of the campaign. There was no secrecy as to who defrayed the expenses of the letters and certainly no unfair advantage over the union, which exercised the same privilege. Apart from these circumstances, the mailing was protected by Section 8(c), which provides that the expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of the Act, if such expression contains no threat of reprisal or force or promise of benefit. It is not contended that anything in these letters was coercive or that they contained any promise of benefit. The contention is that the employer had no right to express or disseminate the views of the employees at their request. We think the broad provisions of the statute clearly cover and protect this action.

■ The finding of the Board with reference to coercive statements charged to have been made by two supervisors, in so far as these statements are found to constitute an unfair labor practice on the part of the respondent, is not supported by the applicable law. The trial examiner found that the occurrences charged were "isolated incidents" and that, although "there was considerable activity engaged in by union employees as well as non-union employees during working time * * * no employee was visited with reprisals for engaging in such activities." He found that the coercive statements did not constitute an unfair labor practice on the part of the employer.

Approximately 200 supervisors with varying degrees of authority are employed by respondent. The president had stated to the employees in several letters that they were free to engage in union activities outside of working time and to join and vote either for or against the union. The two instances charged to constitute violations of the Act each involved only a single conversation with two separate employees and had been specifically forbidden by the president's letter. Some six months prior to the election an employee had requested a supervisor to be allowed to copy his list of names and addresses of all the employees in his department. This request was refused and in the talk which followed the supervisor said, "Are you satisfied with your job?" and, "I hate to see you hurt yourself." This conversation took place the day before the supervisor and the employee received the copies of the talk given by the bank's president condemning such statements. The occurrence was not reported to the management. The other incident occurred several weeks after the election when another supervisor reprimanded an employee for leaving her work during working hours to talk with a claimed officer of the union who was also an employee. The employee reprimanded said that she had been discussing a matter of personal business, but the supervisor made coercive statements to her as to union matters. The supervisor was reprimanded for this conduct by his immediate superior, and the employee criticized was reminded on the witness stand of the request by the management of the bank

that under such circumstances criticism of supervisors for violation of rules should be given to management.

The court in Pittsburgh Steamship Co. v. N. L. R. B., 6 Cir., 180 F.2d 731, affirmed 340 U.S. 498, 71 S.Ct. 453, 95 L.Ed. 479, considered a similar situation in which more extensive violations of the express instructions of the employer by a few minor supervisors were concerned and held that these violations could not be imputed to the employer.

The petition for enforcement is denied.