**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**IRON CITY SASH & DOOR COMPANY OF JOHNSTOWN, Respondent.**

**No. 16160.**

United States Court of Appeals
Sixth Circuit.

Nov. 10, 1965.

Tom Canafax, Jr., Atty., N. L. R. B., Washington, D. C., for petitioner, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Warren M. Davison, Atty., N. L. R. B., Washington, D. C., on the brief.

Roy E. Browne, Akron, Ohio, for respondent.

Before EDWARDS and CELEBREZZE, Circuit Judges, and CONNELL, Chief District Judge.

EDWARDS, Circuit Judge.

This is a petition for enforcement of a National Labor Relations Board order requiring respondent to cease and desist from certain unfair labor practices, as found by the Board, and ordering respondent to offer reinstatement to three employees.

The Board also found that a strike, called by the union involved, was an unfair labor practice strike and ordered respondent to offer reinstatement to those strikers who had unconditionally offered to return to work.

The respondent claims that the discharges were for valid and lawful reasons, and that the strike was not an unfair labor practice strike.

Both parties concede that the basic issue in the case is whether or not there is substantial evidence on the whole record to support the Board's findings of fact.

Ample testimony in the proceeding before the Trial Examiner supports the following facts:

The Teamsters Union [1] first made an approach to employees of this plant May 21, 1963.

---

1. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local 377.

On May 25 of the same year a meeting was held in the Teamsters Union hall in Youngstown where eight of respondent's employees attended and signed application cards. Respondent's drivers LaCivita and Weeden attended that meeting and signed cards, and driver Kuneli, who was not present, signed the membership card shortly thereafter.

On June 2 Kuneli was discharged by manager Mohl, allegedly for burning up a truck motor some six weeks earlier.

On June 3 the Teamsters Union representative called Mohl and asked for contract negotiations. In that conversation he also informed Mohl that LaCivita, the oldest employee in the plant from the point of view of continuous service, was one of the men who had joined the union.

On June 3 LaCivita and Weeden were told they were being laid off for lack of work. Weeden was another employee with much seniority.

On June 4 the Teamsters Union called a strike of the drivers only, and on that date asked for and did confer with manager Mohl, requesting reinstatement of the three discharged drivers and that the company sit down and discuss a contract with them. Mohl in turn indicated that he would have to call the home office in Pittsburgh, and subsequently did so, receiving the advice from respondent's president, Brown, "not to bother talking with" the union. There was no further contact with the union.

On June 6 employees from the production-warehouse portions of the plant joined the strike. Subsequently in early July they transferred their membership from the Teamsters Union to the Steelworkers Union.[2] The strike continued with joint participation of both unions until July 15, when both unions advised the company of the strike's termination, and that the striking employees all unconditionally offered to return to work on July 17. On that date all but one of the strikers presented themselves for work, and the company refused to rehire anybody except LaCivita and Weeden. LaCivita was returned to work immediately; Weeden was reinstated several weeks later. Neither subsequently was allowed overtime, although both had received it prior to layoff, and other truck drivers with less seniority continued to receive it.

This set of facts represents a classic pattern of company response to a union organizing drive. The inference drawn here that the discharges were based on antiunion and, hence, illegal motives rather than on lawful grounds, finds much support just in this outline of events. N. L. R. B. v. Putnam Tool Company, 290 F.2d 663 (C.A.6, 1961).

As Judge Medina said in a somewhat similar case:

"[T]he unexplained coincidence of time with respect to the principal events was really no coincidence at all, but rather part of a deliberate effort by the management to scotch the lawful measures of the employees before they had progressed too far toward fruition. * * * If employees are discharged partly because of their participation in a campaign to establish a union and partly because of some neglect or delinquency, there is nonetheless a violation of the * * * Act." N. L. R. B. v. Jamestown Sterling Corp., 211 F.2d 725, 726 (C.A.2, 1954).

If there be any need for additional evidence of antilabor motive, we think LaCivita's testimony pertaining to his discharge warrants quotation:

"Q. Now, you said you quit at 5:30 p. m. on Monday, June 3, 1963. Before we go any further, was there any indication to you during your working hours on that day that you would be laid off and that you would not be able to work the next day?

"A. No, there was not.

2. United Steelworkers of America, AFL-CIO.

"Q. All right. Now, did Mr. Mohl call you that evening?

"A. Yes, he did.

"Q. What time did he call?

"A. About 6:30.

"Q. Was that at your home?

"A. Yes, it was.

"Q. All right. Tell us from the beginning as best as you can recall what Mr. Mohl said to you and what you said to him during this conversation?

"A. Well, he began by saying, 'This is Vic.' He stuttered around a bit and said, 'He had got a call from Pittsburgh. That he had been given instructions to make a cut back. That I had to be one of them.'

"I asked him, 'What do you mean laying me off? I am one of the oldest men out there.'

"He said, 'He had just been given those instructions and that was it.' He went on to say, 'He had got a call that afternoon from Mr. Sammartino,' another agent from the Teamsters, 'that he had some of our men and they had gone and signed cards. That he wanted to sit down and negotiate a contract.'

"Q. Mr. Sammartino had told that to Mr. Mohl you mean?

"A. Yes. He said, 'I don't know what is going on out there. I know you guys aren't satisfied.' He said, 'I guess you know that there is another dime coming in July,' he said, 'but I know you guys aren't satisfied with that.'

"Q. You said that he said something about you fellows getting another dime, that he knew that you weren't satisfied with that?

"A. That is correct.

"Q. All right. What else was said?

"A. I asked him; 'How he could lay me off when he just hired other men the previous week that couldn't go out into the warehouse and pull a load? They didn't know anything about it. You don't learn it overnight.'

"He said; 'He knew that. He had been given the word from Pittsburgh. He had no choice in the matter.'"

There is much more evidence in this record of a generally similar nature.

This record reviewed as a whole convinces us that there was substantial evidence to support the findings of fact and the inferences drawn therefrom by the Trial Examiner and the Board. N. L. R. B. v. Putnam Tool Company, supra; Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

Enforcement of the Board's order is granted.