### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### TENNESSEE PACKERS, INC., FROSTY MORN DIVISION, Respondent.

Nos. 17183, 17644.

United States Court of Appeals
Sixth Circuit.

March 6, 1968.

See also, 6 Cir., 390 F.2d 787.

Lawrence M. Joseph, Atty., N.L.R.B., Washington, D. C., for petitioner; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Herman M. Levy and Harold B. Zanoff, Attys., N.L.R.B., Washington, D.C., on brief.

Asa R. Ambrister, Nashville, Tenn., and George V. Gardner, Washington, D. C., for respondent.

Before WEICK, Chief Judge, and O'SULLIVAN and EDWARDS, Circuit Judges.

EDWARDS, Circuit Judge.

Since 1958 the National Labor Relations Board has been engaged in seeking to require respondent in these unfair labor practice cases to conform its labor policies to the requirements of the National Labor Relations Act.

The litigation which has resulted is recorded in the following case citations: N. L. R. B. v. Tennessee Packers, Inc., Frosty Morn Div., 124 N.L.R.B. 1117 (1959); 143 N.L.R.B. 494 (1963), enforced, 339 F.2d 203 (6th Cir. 1964); 146 N.L.R.B. 165 (1964), enforced, 344 F.2d 948 (6th Cir. 1965); 154 N.L.R.B. 819 (1965), enforced, 379 F.2d 172 (6th Cir. 1967), cert. denied, 389 U.S. 958, 88 S.Ct. 338, 19 L.Ed.2d 364 (1967).

We consider this background relevant to resolution of the fact disputes pertaining to respondent's motions in the seven discharge, lay-off, or transfer cases brought before us by the current NLRB enforcement petitions. (In No. 17,183 the Board asks this court to enforce its order reported at 153 N.L.R.B. 1411 (1965), while in No. 17,644 the Board seeks enforcement of its orders found at 157 N.L.R.B. 53 (1966) and 158 N.L.R.B. No. 114 (1966)).

Basically, these cases present disputes of fact between the affected employees and respondent's managerial personnel as to what occasioned the disciplinary measures taken. With one exception (not now before us) the Trial Examiner and the Board credited the testimony of the employees and did not credit that of

the management. We have reviewed this conflicting testimony and note that in each instance of discharge, lay-off, or transfer a plausible nondiscriminatory explanation is given by respondent's witnesses, just as an equally plausible discriminatory explanation is provided by the employee testimony.

The credibility of witnesses presenting conflicting testimony is, of course, for the Board to determine. E. g., United Fireworks Mfg. Co. v. N. L. R. B., 252 F.2d 428 (6th Cir. 1958); Houchens Market, Inc. v. N. L. R. B., 375 F.2d 208, 211 (6th Cir. 1967).

Our appellate function is not to determine whether or not these fact disputes are decided correctly, but whether the Board's findings are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e) (1964); Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); N. L. R. B. v. Tennessee Packers, Inc., 379 F.2d 172, 180 (6th Cir.), cert. denied, 389 U.S. 958, 88 S.Ct. 338, 19 L.Ed.2d 364 (1967).

In each of these cases (excepting that of Helen Latta, which we deal with separately hereafter) we hold there was substantial evidence that 1) each employee was an experienced employee with a satisfactory work record; 2) the individual concerned was known by the respondent to be an active union adherent; 3) the discharge, lay-off, or transfer was not in accord with the individual's seniority status as compared with at least some unaffected employees; and 4) each such discharge, lay-off, or transfer was effected by respondent in the immediate aftermath of some union activity (or the result of some union activity) on the part of the employee concerned.

We have previously dealt with the matter of proximity between recent union activity protected by the NLRA and measures taken against employees which are defended by the employer on non-discriminatory grounds. Such proximity can lend support to a Board inference of unfair labor practice. N. L. R. B. v. Iron City Sash & Door Co., 352 F.2d 437, 438 (6th Cir. 1965); N. L. R. B. v. Delight Bakery, Inc., 353 F.2d 344, 345 (6th Cir. 1965); See also N. L. R. B. v. Jamestown Sterling Corp., 211 F.2d 725 (2d Cir. 1954).

In this last case, Judge Medina said:

"[T]he unexplained coincidence of time with respect to the principal events was really no coincidence at all, but rather part of a deliberate effort by the management to scotch the lawful measures of the employees before they had progressed too far toward fruition. * * * If employees are discharged partly because of their participation in a campaign to establish a union and partly because of some neglect or delinquency, there is nonetheless a violation of the * * * Act." N. L. R. B. v. Jamestown Sterling Corp., 211 F.2d 725, 726 (2d Cir. 1954).

Without seeking to analyze all of these cases in detail, we set out the substantial facts which support the NLRB's findings in the two which appear to us to offer the strongest cases for respondent.

James Gough was discharged by respondent for "refusal to do the work." He had been an employee for 10 years prior to the discharge. He was the first Negro in the cattle kill department to put on a union button. He testified that after he put the button on his foreman "commenced riding" him. He testified that on the day he was discharged additional duties had been added to his job and he couldn't keep up. He flatly denied refusing to do the work.

The Trial Examiner and the Board found:

"I am convinced and find that Respondent was not truly motivated by its asserted reason for discharging Gough, an employee of almost 10 years of service. Gough was the first Negro employee to wear a union button openly at work in the hog and cattle kill departments. In the course of his work, he came in contact with a considerable number of other Negro employees in these departments. Both McGregor and Barnes admitted seeing

Gough wear his union button. Coincidental with his commencement to wear a union button, McGregor began to criticize him constantly about his work, so that all the employees in the department decided to remove their buttons shortly before his discharge in an effort to relieve Gough of this criticism. On the morning of April 27 McGregor seized upon Gough's attention to his primary and required offal removing duties which kept him from getting to perform the extra hide work which had been assigned to him during the last 2 months and, instead of giving him some requested help with the offal work, summarily discharged him. Although Gough had never refused to work on the hides but had merely pleaded with McGregor for some help with his offal removing duties so as to enable him to get to the hides. McGregor thereafter asserted that Gough was discharged on the obviously erroneous and pretextious ground that he had refused to perform his work. Barnes acquiesced in the decision to discharge McGregor, although he knew at that time that most of Gough's offal removing functions would soon be eliminated, as in fact it was by the time of the instant hearing, by the new equipment then in the process of being installed. Gough was then replaced by Long, a Negro employee known by Respondent to be a nonsupporter of the Union because he openly wore a red or 'company' button at work. Thereafter, Long was given help on the kill floor at different times and by the time of the instant hearing was employed in the tank room with very little to do because the changeover in equipment had eliminated the wheelbarrow or buggy work formerly performed by Gough.

"Upon consideration of all the foregoing in the light of Respondent's unfair labor practices, I am convinced and find that in discharging James Gough Respondent was truly motivated by antiunion considerations, including a desire to rid itself of a Negro employee who openly displayed his support for the Union while coming in contact with other Negro employees in the kill departments and to discourage such other Negro employees from supporting or expressing support for the Union. By such conduct, Respondent discriminated with respect to the hire and tenure of employment in violation of Section 8(a) (3) and (1) of the Act."

Paul Williford was a skilled calf skinner and grader. He testified that he had been made the foreman's "right-hand man" and was paid the highest rate in the department until he started passing out union literature. Then his duties were changed, he was laid off and he was never called back.

Respondent blamed his layoff on a seasonal reduction in sales.

The Trial Examiner and the Board found:

"I find that Respondent's asserted reasons for laying off Williford in April 1965 were not the true motivating reasons. Barnes admitted that he saw Williford wearing his union button and that prior to that time Williford had always talked against the Union. Williams' attitude towards Williford changed when he was informed that Williford was openly and actively promoting the Union. He changed Williford's duties and began to check him closely on his breaks. It was during such breaks and in the washroom that Williford distributed the union literature in envelopes to about 75 employees during his last 3 weeks, including the very day of his layoff. Without any prior warning or notice, he was summarily laid off during Lent when a production decline was customary in the past, contrary to Respondent's practice in some previous years of assigning other tasks for the employees in the veal department during slack periods, and without waiting to see if production would increase after Easter as it had in the past. Although the record is replete with examples of Respondent's transfer of employees to

other departments and although new employees were in fact hired in other departments after Williford's layoff, his request for a transfer to another department was ignored. During the weeks that Williford called back after his layoff, he was informed by Williams that there was not the slightest indication of a business pickup despite the fact that Respondent's own exhibit, prepared by Williams, shows a decided increase in the number of calves skinned after Williford's layoff. Finally, after Respondent was informed of the unfair labor practice charge filed on Williford's behalf in connection with his layoff, Williams informed Williford that there was no need for him to call any more and that his case would be settled in court.

"Upon consideration of all the foregoing, considered in the light of Respondent's other and similar unfair labor practices found by the Board in prior decisions, I am convinced and find (1) that on April 13 or 14, 1965, Respondent laid off Williford in deprisal (sic) for his activities in support of the Union; (2) that, in any event, even accepting Respondent's defenses as to the decline in the veal and calf skinning business which would warrant a layoff and as to Williford's work performance and seniority status, the decision to lay off Williford at that time was primarily motivated by anti-union considerations, and (3) that beginning with May 24, 1965, Respondent refused to consider Williford for re-employment because he had caused unfair labor practice charges to be filed against Respondent. By the foregoing conduct, Respondent violated Section 8(a) (1), (3) and (4) of the Act."

The unfair labor practice (8(a) (3)) findings of the Board in relation to these two and the other four employees, and the findings of threats and reprisals in violation of 8(a) (1) do not necessarily correspond to the views of all members of this panel. But we cannot say that they are unsupported by substantial evidence on the whole record.

Enforcement of the Board's order is granted, again excepting the discharge case of Helen Latta.

Helen Latta had worked for respondent for seven and one-half years. She had never had any complaints about her work until she testified in a prior NLRB hearing in July of 1963 and served as an observer for the union in elections in 1963 and 1964. Thereafter she testified she was transferred twice with the result of a reduction in her total earnings. Subsequently she was discharged by respondent on the grounds that she was five months pregnant. As to her the Trial Examiner said:

"The case of Helen Latta presents a different situation. There, against the background of Latta's known union activities, the Respondent's demonstrated union animus, the fact that Latta was a long time employee, and the timing of her discharge soon after acting as an observer for the Union and testifying on its behalf, the Respondent attempted to defend its action in terminating Latta, an otherwise satisfactory employee, by its assertion of a rule requiring pregnant employees to terminate their employment after 5 months of pregnancy."

The Trial Examiner and the Board concluded:

"[U]nder all of the circumstances, that the rule was asserted by the Respondent not for any purpose of protection of the employees who were pregnant but merely for the purpose of the Respondent's ridding itself of a strong union adherent. I conclude therefore that Latta's discharge was motivated by her union activity and was, by reason thereof, violative of the Act."

A majority of our panel feels that on consideration of this record as a whole, there is no substantial evidence to support the Board's finding that this discharge was discriminatory as opposed to a proper application of a rule the company had a right to adopt. The fact that

she was a known union supporter, a union observer, and was called but did not testify in a Board hearing, did not insulate her against discharge for a legitimate reason.

Enforcement of the Board's order as to Helen Latta is denied.