**COLONIAL CORPORATION of America and Leonard Friedman, Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 18899.**

United States Court of Appeals, Sixth Circuit.

April 30, 1970.

Edwards, Circuit Judge, dissented and filed opinion.

---

Anthony J. Leggio, Atlanta, Ga. (Mitchell, Clarke, Pate & Anderson, Atlanta, Ga., on the brief), for petitioners.

Charles R. Both, N.L.R.B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Leonard M. Wagman, Atty., N.L.R.B., Washington, D. C., on the brief), for respondent.

Before WEICK, Chief Judge, O'SULLIVAN and EDWARDS, Circuit Judges.

O'SULLIVAN, Circuit Judge.

Petitioners, Colonial Corporation of America and Leonard Friedman, Colonial's chief executive officer, seek review, and National Labor Relations Board asks enforcement, of an order entered by the Board on June 8, 1968. The Board's order is reported at 171 NLRB No. 185. Affirming its trial examiner, in part, the Board held that Colonial and Friedman violated Section 8(a) (1) and (3) of the Act, 29 U.S.C. § 158(a) (1) and (3). The trial examiner, finding *no discrimination* in the selection of those to be laid off, required Colonial to place their names on a preferential hiring list to be offered reemployment when open-ings, if any, occurred. The Board, however, ordered that all 144 employees terminated be reinstated with back pay, with the burden on Colonial to prove which terminated employees "would be employed at present if no discrimination had been practiced."

This is a novel case. There is no evidence that any terminated employee was a member or desired to become a member of the Teamsters, Chauffeurs, Helpers and Taxicab Drivers Local Union 327, the involved union. The Teamsters did not claim that any employee had signed a card applying for membership in the union. There was no evidence that any Colonial employee was a union activist. No employee or former employee of Colonial made any charge against it. All charges were made by Teamsters' agents, asserting that named employees of Colonial had been terminated "because of their membership and activities in behalf of Teamsters, Chauffeurs, Helpers and Taxicab Drivers, Local Union No. 327." At the hearing no proofs supported this charge.

The proofs offered by the General Counsel attempted, instead, to make out company violations of Section 8(a) (1) and (3) on the basis of the following alleged circumstances:

1) Upon hearing that the Teamsters were about to attempt to organize Colonial employees, Colonial held two meetings of its employees which were addressed by respondent Friedman whose remarks were calculated to discourage membership in the Teamsters;

2) A group of citizens of the City of Woodbury, Tennessee, where the involved plant of Colonial was located, held a meeting out of which came the printing and distribution of a handbill entitled by its authors, "Fairy Tales or Facts?"

3) Thereafter, Colonial did not repudiate the assertions of the handbill, even though it knew that some were false. Instead, it gave publicity to a statement that it was not responsible

for the content of the handbill, and admonished its employees that Colonial "has expressed and will continue to express its *own* views and policies concerning its affairs." (Emphasis supplied.) ; and

4) Thereafter Colonial laid off and terminated some of its employees.

Before us, Colonial argues that the matter of the publication of the handbill and Friedman's published comment thereon were not made the subject of a specific charge or complaint. However, no exception to the trial examiner's consideration of this proof was made, and we will not now consider this contention. Section 10(e) of the Act, 29 U.S.C. § 160, forecloses our doing so.

1. Friedman's speeches.

Having received an anonymous telephone call that the Teamsters were going to organize Colonial's employees, Friedman addressed two groups of respondent employees. He discussed the company's economic problems and the matter of contemplated layoffs. He told the employees that he felt that a union would not be in the best interests of Colonial's employees. In any event, the trial examiner found no violation in Friedman's conduct in this regard. He said:

"I do not believe the evidence preponderates in favor of a finding that Friedman's foregoing speech contained any threat to close the plant. I find only that in his speech Friedman expressed a strong preference for operating without a union and asserted that he would use every legal means to prevent organization of the plant."

The Board did not question this holding.

2. The handbill "Fairy Tales or Facts."

After the townspeople learned that the Teamsters were engaged, or were about to engage, in a campaign to organize the employees of Colonial, a citizens' meeting was held—probably called by the President of Woodbury's only bank. It was found that while Friedman appeared at this meeting, he left before the plan to issue a handbill was formulated; and that he was not responsible for the content of the handbill or the factual misstatements therein. After recitation of the economic good that had come to the people of Woodbury from the location there of Colonial's plant, the handbill continued:

"We think it's high time the voice of reason was heard again in Woodbury. We've heard all over our county in the past few weeks the seeds of hate and hunger sown by strangers who suddenly have developed an interest in us. Where they've been for the past 10 years only the newspapers and police reports can tell us. They've brought with them the threat of violence and the promise of brutality that is their trademark (ask the people of Lawrenceburg and Tullahoma) and they have threatened what they would 'make' Colonial do; how they would 'protect' the workers. (Nobody needed protection before they rolled into town.)

"The Teamsters have bragged that they would force the factory to stay open. Don't be fooled, we know this is a calculated lie. It is common knowledge since the beginning of Colonial that this is a nonunion company and they would not attempt to operate under a union. This policy has been tested at Spring City, Altamont and Erin. At Spring City and Altamont, the plants were closed and remained closed for several months and were reopened only after demonstrations in force of the earnest desire on the part of the community to go back to work on the basis of Colonial policy. At Erin, where in excess of 360 were working, an election was held and after seventeen months no contract has been signed—employment is now 54. In view of these demonstrated facts, we believe that Colonial will continue its stated policy and the Woodbury plant will stay closed unless the em-

ployees reject the imported agitators. Common sense tells us that now is the time to pull together as a community to keep the shirt factory open."

After hearing the evidence concerning the meeting and the issuance and distribution of the handbill, the trial examiner concluded:

"Accordingly, I am inclined to believe that both Cook and Adams were honestly mistaken as to the sequence of events at the meeting and deem more reliable the recollection of the other witnesses that Friedman left before Cummings' appeal for joint action. Moreover, even if it be assumed that Friedman was present during such appeal, it is not clear that this alone would suffice to establish Colonial's or Friedman's liability for the coercive statements in the facts sheet."

3. Colonial's failure to repudiate.

Admittedly, the handbill's averments that certain plants of Colonial had been closed because of Colonial's alleged purpose not to operate under a union were false. After Colonial became aware of the distribution of the handbills, it caused to be published in a local newspaper an article which, after making reference to Colonial's then economic problems, concluded:

"Mr. Friedman further states, 'It has come to the attention of Colonial Corporation of America that a Committee of Interested Citizens For Continued Progress has been Organized to state its views on the efforts of the Teamsters Union to organize Colonial employees in Woodbury.

"Colonial Corporation feels that it is the right of every citizen interested in community affairs to freely express himself in such matters. *However, it should be understood that Colonial is not responsible for this Committee's activities, publications and views.*

"Colonial has expressed and will continue to express its *own* views and policies concerning its affairs." (Emphasis supplied.)

The trial examiner found this statement to be a violation because Colonial did not, through the voice of its chief executive, Friedman, repudiate the misstatements of this handbill distributed by the Citizens' Committee. He said:

"Thus, although the 'fact sheet,' in effect, imputed to Colonial a policy of locking out its employees to avoid collective bargaining, which policy would constitute flagrant defiance of an Act of Congress, Friedman not only did not see fit to deny the imputation but took the position that, in ascribing to Colonial such a policy and predicting that it would be employed at Woodbury, the Committee was merely performing a civic duty. Where A publishes an allegation that B is a chronic law-breaker and B publishes a reply in which he fails to take issue with such allegation and, in effect, condones the dissemination thereof, the inference which will normally be drawn therefrom is that B admits the truth of the allegation. So, here, Friedman's foregoing comment would be likely to be regarded by a reader thereof as a tacit admission that Colonial had a policy of curtailing operations to combat Union activity and would pursue that policy at Woodbury. The publicizing of such an 'admission' could not fail to have a coercive effect on those readers of Friedman's remarks who were employees of Colonial. Accordingly, it is found that, by releasing to the local press the foregoing comment on the 'fact sheet,' which comment was calculated to convey the impression that Colonial did in fact have a policy of mass layoffs to combat Union activity and would apply that policy at Woodbury, Friedman and Colonial violated Section 8(a) (1) of the Act."

We recognize that an employer violates Section 8(a) (1) by threatening to retaliate against employees because of their union activity. N.L.R.B. v. Bin-Dicator Co., 356 F.2d 210 (6th Cir. 1966); N.L.R.B. v. Austin Powder Co., 350 F.2d 973 (6th Cir. 1965). Further

an explicit threat is not required if language used by employers can reasonably be construed to be such. N.L.R.B. v. *Electric Steam Radiator Corp.*, 321 F.2d 733 (6th Cir. 1963). In Surprenant Mfg. Co. v. N. L. R. B., 341 F.2d 756 (6th Cir. 1965), we said:

"[I]f the inference or conclusion found by the Board that the statements constituted a threat is a reasonable one, which it was permissible for the Board to make its conclusion will not be set aside on review, even though a different inference or conclusion may seen plausible or reasonable to us." 341 F.2d at 760.

While Friedman's comment did not say that any part of the handbill was false, he did say that Colonial was not "responsible for this Committee's *activities, publications and views*," and finished by saying that Colonial had expressed and would "continue to express its *own* views and policies concerning its affairs." This could be read as Colonial's admonition to its people to look *only to it* to learn its views and policies. There was nothing untrue in Friedman's statement. The contest before us poses the question whether there is an affirmative duty on an employer to make public denial of any inaccuracy uttered by citizens of a small town who do not like the Teamsters Union and whose zeal, mistaken or not, to protect local payrolls leads them to inaccurate statement. The examiner found that no one among Colonial's people had anything to do with the composition or distribution of the inaccurate handbill. The free speech guarantee of Section 8(c) of the Act provides:

"(c) The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c).

In Automation and Measurement Div'n, *Bendix Corp.* v. *N.L.R.B.*, 400 F. 2d 141, 145, 6 Cir., we said:

"In this Circuit we have upheld the right of free speech in a Union organizational campaign and stated that its exercise should not be narrowly restricted. *N.L.R.B.* v. *Uniform Rental Serv.*, 398 F.2d 812 (6th Cir. 1968); *N.L.R.B.* v. *Hobart Bros. Co.*, 372 F.2d 203 (6th Cir. 1967); *Surprenant Mfg. Co.* v. *N.L.R.B.*, 341 F.2d 756 (6th Cir. 1965); *Union Carbide Corp.* v. *N.L.R.B.*, 310 F.2d 844 (6th Cir. 1962)."

■ We deal with a close question, but in the special facts of this case, which discloses no contest between *employees* and employer, we decline to hold that Friedman's statement was a "threat of reprisal or force or promise of benefit."

### 4. The layoffs and terminations.

Having found that Colonial and Friedman were attempting to keep the Teamsters out of its Woodbury plant by failure to repudiate the handbill, the trial examiner concluded that certain layoffs and terminations of some of its employees, that came shortly after the appearance of the union, were part of the company's effort to keep the union out of the plant. The examiner concluded:

"It follows that by the foregoing terminations and layoffs Colonial and Friedman violated Sections 8(a) (3) *and* (1) of the Act." (Emphasis supplied.)

The Board affirmed this finding.

The trial examiner arrived at his conclusion despite his recognition that the layoffs and terminations had an economic justification. The following spontaneous utterance by the trial examiner at the conclusion of the hearing is amply supported by the evidence:

"Frankly, Mr. Leggio [Colonial's counsel] I am convinced that this company *was going down the drain* so to speak in the fall of '65 and that even-

tually would have had to curtail production as your exhibits in evidence show."

He then went on to speculate whether the carrying on of the admittedly needed reduction was taken advantage of to frustrate the Teamsters:

"The question is, did it have to do it at that particular time and did they *perhaps* rush their action *a little* because of the union, *even a week or two* that they rushed it, that they advanced their time table. I am a little puzzled as to why those two weeks of almost complete cut off of operations, I might *suspect* that *maybe* they were trying to drive this lesson home, that you can't fool around with the union. *So this question of sales falling off, isn't going to help me very much.* They still wouldn't be able to tell that they were justified in laying off these people on November 15th and December 15th. They couldn't testify on that and that *is the only thing that I am really concerned with.*" (Emphasis supplied.)

We do not believe that a finding of guilt can be fashioned out of such speculation. Admitting that a company was "going down the drain," can guilt be founded on the pondering of a trial examiner whether *perhaps* this failing company rushed this needed action a *little*, "even a week or so" and because he might "suspect" that *maybe* the company was trying to discourage Teamsters? We do not think he can dismiss the clear proof of the company's falling off of business by saying that it "isn't going to help me very much." It was the company's position and proof that all of the layoffs and terminations in the months of November and December, 1965, were but the carrying out of a plan that had been made prior to its knowledge that the Teamsters Union was about to attempt organization of the Woodbury plant.

There was clear evidence that a falling off of business in July and August of 1965 made it necessary to curtail production, with a consequent termination of employment. Colonial's efforts to maintain the business, such as reducing prices and hiring additional salesmen, were to no avail. Only a real prospect that a merger with another company would obviate the need for reductions in Colonial's operations caused any postponement of the carrying out of the plans made. By October of 1965, however, the hoped-for merger had failed to materialize. When it became evident that the merger had fallen through, the previously planned reduction was put into effect. It took the form first of a 15% termination of the office employees and then a two week total layoff while the plant was shut down from November 22 to December 6, 1965. There was undisputed testimony that this timing was employed to make the layoff more acceptable to the work force, which was composed largely of women who could use this period for Thanksgiving preparations and Christmas shopping. After reopening, more employees were terminated, and by December 17, 1965, a total of 144 employees had been terminated.

Since the start of these layoffs in November, 1965, the payroll at Woodbury steadily declined from 1111 to 469 in April, 1967. None of those laid off in December, 1965, have been reemployed; *none of them have been replaced;* none of the other plants of Colonial have taken over work from Woodbury; and similar employee reductions in other Colonial plants were experienced, at which no union organizing was involved. There is no evidence that any of Colonial's employees, those retained or those discharged, were activists for, or even interested in, the union. There is no evidence that even one of the laid off or terminated employees was a union protagonist; nor that any signed an application for membership in the Teamsters Union, or even evidenced a desire or intention to do so. During the hearing, the following colloquy between the trial examiner and the general counsel took place:

"Trial Examiner: * * * I don't think there is any proof that any par-

ticular one of these people laid off was a union adherent is there?

Mr. Higgins: [General Counsel's representative] You mean specific employees because they were union adherents?

Trial Examiner: Yes.

Mr. Higgins: No, sir.

Trial Examiner: The theory of your case is this was a blanket layoff regardless of union adherence, through discouraging activity?

Mr. Higgins: Union adherence of any persons laid off, do you?

Trial Examiner: You don't know if there were any union persons among employees laid off, do you?

Mr. Higgins: No, sir, but there is testimony by certain witnesses—"

There was no evidence that any employee, terminated or laid off, was *discriminated* against because of union adherence.

In support of its conclusion that the terminations violated Section 8(a) (3), the Board cites this Court's decision in N.L.R.B. v. Cambria Clay Prods. Co., 215 F.2d 48, 56 (6th Cir. 1954). However, in that case, as well as in our later case of N.L.R.B. v. Ellis and Watts Prods. Inc., 344 F.2d 67, 69 (6th Cir. 1965), the discharged employees were activists for and members of a union. The trial examiner made it clear that such is not the case at bar. He said:

"I don't think there is any proof that any particular one of these people [those laid off] was a union adherent."

However much the Courts have allowed the Board to draw legitimate inferences, it is nevertheless the General Counsel's burden to prove its case against an employer. N.L.R.B. v. Murray Ohio Mfg. Co., 326 F.2d 509, 513

(6th Cir. 1964); Lawson Milk Co. v. N.L.R.B., 317 F.2d 756, 760 (6th Cir. 1963); N.L.R.B. v. Cleveland Trust Co., 214 F.2d 95, 99 (6th Cir. 1954).

The Supreme Court has made discrimination, or a purpose to discriminate, the touchstone of violation of § 8(a) (3)[1]. In Radio Officers Union of Commercial Telegraphers Union, A.F.L. v. N.L.R.B., 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954), the Court said:

"The language of § 8(a) (3) is not ambiguous. The unfair labor practice is for an employer to encourage or discourage membership *by means of discrimination*. Thus this section does not outlaw all encouragement or discouragement of membership; only such as is accomplished *by discrimination* is prohibited." 347 U.S. at 42, 74 S.Ct. at 337. (Emphasis supplied.)

In American Ship Building v. National Labor Relations Board, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965), the Supreme Court said:

"Under the words of the statute [§ 8(a) (3)] there must be both *discrimination* and a resulting discouragement of union membership." 380 U.S. at 311, 85 S.Ct. at 963.

We hold, therefore, that Colonial did not violate § 8(a) (3).

The Board's finding of a violation of 8(a) (1), as noted in the quoted portions of the trial examiner's decision set out above, was based on the notion that Colonial's conceded economic problems were used to thwart the union campaign. The only possible evidence of union animus in the terminations is their timing —their closeness in time to the company's awareness that Teamsters were about to attempt organization of Colonial's employees. The Board relied in its decision on Barnwell, 163 N.L.R.B. No. 8. We, however, reversed the Board in such case, Barnwell Garment Co. v. N.

---

1. 29 U.S.C. § 158(a) (3) reads in pertinent part:

"(a) It shall be an unfair labor practice for an employer—

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."

L.R.B., 6 Cir., 398 F.2d 777, saying at 778:

> "Clearly a company may curtail its work force for economic reasons, notwithstanding the plant employees' union representation or organizing efforts."

As recited above, these terminations were also clearly the result of economic conditions, conditions which led the trial examiner to admit that this company was "going down the drain." In the case of N.L.R.B. v. West Side Carpet Co., 329 F.2d 758, 761 (6th Cir. 1964), this Court held that an employer may not use a need for cutting expenses to rid itself of a *union activist*. We said:

> "Even though part of the motivation for Weber's discharge might have been a needed cutting of expenses, such circumstance could not ·be legally used to effectuate a companion motive to rid the company of a union protagonist." 329 F.2d 761.

Here, however, we have held that there was no discrimination, no firing of union protagonists. The trial examiner recognized the absence of discrimination after saying that the terminations were to "discourage union activity" he went on to say:

> "However, as to the foregoing terminations, there is no dispute that the employees involved were selected on a *nondiscriminatory basis,* that they were not replaced, and that the present plant complement is far below the level that prevailed in late 1965, and there is no evidence that the present level of operations is due to *discriminatory* considerations rather than to supervening economic developments." (Emphasis supplied.)

The Board, however, insisted that there was *discrimination.* It said:

> "Having proven that the respondent discharged employees for *discriminatory* reasons * * *. The burden of proof on such issue rests with the Respondent and determination of which employees, if any, would be employed at present if no *discrimination* had been practiced can be made at the complaint stage of the proceeding." (Emphasis supplied.) .

We have already emphasized that in this shifting of the burden of proof, the Board relied on N.L.R.B. v. Cambria Clay Products Co., 215 F.2d 48, 56 (6th Cir. 1954), and N.L.R.B. v. Ellis and Watts Products, Inc., 344 F.2d 67, 69 (6th Cir. 1965). In both of these cases, however, there was clear proof that discharged employees were members of, and activists for, the union involved. That is not this case.

 The fact that knowledge of the Teamsters' planned drive came along shortly before implementation of plans already made, cannot convert justified economic reductions in the work force into an unfair labor practice. In the absence of a showing of discrimination against *employees* and a company purpose to thwart *employee* efforts to organize, Colonial cannot be held in violation of Section 8(a) (1). That Section merely protects the rights of *employees,* (1) to join or assist labor organizations, or (2) to engage in concerted activities in order to bargain collectively, or (3) to refrain from such activities except as affected by collective bargaining agreement, as authorized in Section 8(a) (3).[2] No case has been cited to us, nor

2. "29 U.S.C. § 158. Unfair Labor practices.
　　(a) It shall be an unfair labor practice for an employer—
　　(1) to interfere with, restrain, or coerce *employees* in the exercise of the rights guaranteed in section 157 of this title;"
　　"§ 157. Right of employees as to organization, collective bargaining, etc.
　　*Employees* shall have the right to self-organization, to form, join, or assist labor

organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring mem-

does our own research provide us with a decision which says that Section 8(a) (1) of the National Labor Relations Act was designed to assist the Teamsters, or any other union, to organize the employees of a company, without reference to the rights and wishes of such employees.[3]

The order of the Board is denied enforcement.

EDWARDS, Circuit Judge (dissenting).

Petitioner seeks to set aside and the Board seeks enforcement of an order of the National Labor Relations Board.

Petitioner operated a shirt factory in Woodbury, Tennessee, employing approximately 1,000 people. The Teamsters started an organizing campaign in October 1965.

Word of this came promptly to the attention of Colonial Corporation and its reaction was immediate and vigorous, as indicated in the following findings of the Trial Examiner and the Board:

> "Friedman who was then Colonial's vice president, was promptly apprised of this campaign by an anonymous telephone call. The next day he addressed the assembled employees, referring to this call, and made some remarks adverse to the Union. Subsequently, during the week ending November 12, Colonial terminated about 15 office employees, comprising 15 percent of the office force at Woodbury. On November 15, in speeches to the employees Friedman was again critical of the Union, and warned that

there would be further terminations, which would affect the production employees, and, in fact, during that week 111 production employees were terminated. Thereafter, from November 22, to December 6, there was a virtual suspension of all operations. On December 6, operations were resumed and are still continuing. The terminated employees have not been replaced."

While the above events were transpiring a meeting of local businessmen of Woodbury was held at the local bank. Friedman, on behalf of Colonial, addressed the meeting, stated the company's position against unionization, and answered questions about three other Colonial plants. After Friedman left the meeting, the Citizens' Committee decided to issue a leaflet. The leaflet was distributed during the time following November 22, when Colonial had laid off practically all of the employees for a period of approximately two weeks. It said in part:

> "The teamsters have bragged they would force the factory to stay open. Don't be fooled, we know this is a calculated lie. It is common knowledge since the beginning of Colonial that this is a nonunion company and they would not attempt to operate under a union. This policy has been tested at Spring City, Altamont and Erin. At Spring City and Altamont the plants were closed and remained closed for several months and were reopened only after demonstrations in force of the earnest desire on the part of the

---

bership in a labor organization as a condition of employment as authorized in section 158(a) (3) of this title." (Emphasis supplied.)

3. This opinion was written upon the assumption that the briefs and appendix contained accurate accounts of the facts needed to be considered on the appeal. Upon its completion, the author was concerned whether examination of the full transcript might disclose some evidence that the Teamsters had, in fact, obtained membership cards from employees of

Colonial which might have been effective in supporting the Teamsters. The full transcript disclosed that one employee testified she signed a membership card, which card was not offered in evidence; another employee wore a union button after she returned to the plant after layoff. There was no evidence of the company's awareness of these circumstances. In our view, disclosure of these circumstances does not in any way change the conclusion expressed by us in the opinion as originally drafted.

community to go back to work on the basis of Colonial policy. At Erin, where in excess of 360 were working, an election was held and after seventeen months no contract has been signed—employment is now 54. In view of these demonstrated facts, we believe that Colonial will continue its stated policy and the Woodbury plant will stay closed unless the employees reject the imported agitators. Common sense tells that now is the time to pull together as a community to keep the shirt factory open."

This leaflet was widely distributed. Four employees testified that they had received it through the mail.

On December 2, Colonial authorized a statement in the local newspaper wherein Mr. Friedman said essentially that Colonial disclaimed any responsibility for the views expressed by the Committee in the leaflet concerning the union's organizational drive at Woodbury, but that every citizen had a right freely to express his views. Friedman did not, however, deny the statements made in the leaflet as recorded above concerning the company's antiunion policy and its implementation of that policy at the three plants concerned.

From these facts the Trial Examiner and the Board concluded that respondent had violated section 8(a) (1) by referring to the leaflet, failing to deny its statements, and thus tacitly adopting them.

The Board also found that the November 22 layoff and the indefinite layoffs of approximately 147 employees at the Woodbury plant represented discriminatory layoffs in violation of section 8(a) (3).

Friedman testified before the Trial Examiner that all of the layoffs were occasioned by economic problems, including the advent of a process known as "Perma-press" in the clothing industry. The Trial Examiner and the Board found serious doubt about the credibility of Friedman's testimony on this score and concluded:

"Accordingly, I conclude that such layoffs were an integral part of Colonial's antiunion strategy, which was to discharge the less efficient, marginal employees as soon as this could be done without disrupting current operations, and to give the rest of the work force a 2-week layoff, so as to bring home to all the employees Colonial's displeasure over the Union campaign and the risks the employees would be incurring by espousing the Union. It follows that by the foregoing terminations and layoffs Colonial and Friedman violated Section 8(a) (3) and (1) of the Act."

The Trial Examiner, however, did not order reinstatement of all of the employees, holding that they should be reemployed from a preferential list "as openings occur," thereby apparently recognizing that there had been reduced production schedules at the Woodbury plant. The Board, however, took the point of view that backpay should be determined in the compliance stage of the proceeding as follows:

"Having proven that the Respondents discharged employees for discriminatory reasons, General Counsel did not also have to prove that the employees would have been employed at present, if no discrimination had been practiced. The burden of proof on such issue rests with the Respondents and determination of which employees, if any, would be employed at present if no discrimination had been practiced can be made at the compliance stage of the proceeding."

The record in this case taken as a whole (including the proximity of the layoffs to the organizing campaign) contains more than substantial evidence to support the findings of section 8(a) (1) and (3) violations. N.L.R.B. v. Iron City Sash and Door Co., 352 F.2d 437, 438 (6th Cir. 1965); N.L.R.B. v. Tennessee Packers, Inc., 390 F.2d 782 (6th Cir. 1968).

The remedy ordered by the Board is entirely appropriate to the circum-

stances of this case. *See* N.L.R.B. v. Cambria Clay Products Co., 215 F.2d 48, 56 (6th Cir. 1954), and cases cited therein.

I would grant enforcement of the Board's order.