849 F.2d 608
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
The ARMSTRONG RUBBER COMPANY, Petitioner, Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.
 Nos. 87-5518, 87-5634.
 United States Court of Appeals, Sixth Circuit.
 June 16, 1988.
 
 Before KEITH, BOYCE F. MARTIN, Jr. and RYAN, Circuit Judges.
 KEITH, Circuit Judge.
 
 
 1
 Petitioner, The Armstrong Rubber Company (Company), seeks review of an order of the National Labor Relations Board holding that the Company had violated Secs. 8(a)(3) and (1) of the National Labor Relations Act, 29 U.S.C. Secs. 158(a)(B) and (1), requiring the Company to reinstate certain employees who were terminated allegedly because of a belief that the employees were engaging in union activity, to cease and desist from engaging in the alleged violations and from interference with the exercise of rights under the Act, and other remedial measures. Respondent NLRB has cross-applied for enforcement of its order. For the following reasons, we deny the petition for review, and we enforce the order of the Board.
 
 I.
 
 2
 The Company is engaged in the manufacture of tires in Madison, Tennessee and three other plants. The Union has represented a unit of hourly-paid production and maintenance employees at the Madison plant since 1962. Affiliates of the Union also represent employees at the Company's other plants.
 
 
 3
 Before April 8, 1986, the Madison plant employed twelve Quality Control Technicians, who were responsible for quality assurance at all stages of the manufacturing process, as well as inspectors of the finished product. Quality Control Technicians are salaried positions, and the Quality Control Technicians at the Madison plant were not members of the bargaining unit.
 
 
 4
 In late November, 1985, Richard Twickler, the Company's vice-president of manufacturing, told Bryant Reed, general manager of the Madison facility, to reduce the tire production schedule from 14,500 to 12,500 tires a day by December. During December, the Company laid off approximately sixty-five hourly-paid employees out of 574 who were employed as of December 1. Notwithstanding this reduction, the number of salaried employees remained fairly constant between March, 1985 and April 1, 1986.
 
 
 5
 In late March or early April of 1986, Twickler ordered Reed once again to reduce tire production to 9,000 per day, as of May 1, 1986. Soon thereafter, but before April 8, 1986, Twickler encouraged Reed to "look very closely" in the "area" of salaried personnel at the Madison plant, "to look towards an organization of his staff, to try to eliminate any areas of redundancy, and to move in that direction." No decision was made at this point to terminate any particular number of salaried personnel.
 
 
 6
 On or about April 1, 1986, Reed determined that the number of salaried employees at the Madison plant should be reduced by twenty-one. It was decided, after consultation with the division managers (including Kim McAllister, head of the Technical and Quality Control Division), that the cuts would be allocated as follows: ten from the manufacturing division; three from the engineering section; one each from the industrial relations section, the distribution section, and the accounting/purchasing section; and five from the technical and quality control division. Reed asked his division managers to recommend to him by April 7 what job classifications should be included within the divisional quota of cutbacks.
 
 
 7
 On April 1 and 2, Reed met with the salaried personnel, where he informed them that twenty-one of their number would have to be terminated effective April 11, that those to be terminated would be notified by April 7 or 8, and that the distribution of cutbacks would be that previously decided upon by Reed and the divisional managers. Moreover, Reed noted that any persons who volunteered for retirement would be included among the twenty-one terminations, and invited such offers of retirement. Further, Reed told them that the particular individuals to be terminated had not yet been selected, but that the Company intended to target junior personnel. Reed went on to announce that, in May, there might be further cuts in production, with an attendant salaried workforce reduction of eight or nine persons, and that the layoffs would probably occur in the manufacturing division.
 
 
 8
 On Friday, April 4, pursuant to Reed's request for recommendations, McAllister informed her subordinate, Quality Control Superintendent Don Dickenson, that their divisional cutback quota was five employees, and asked him for recommendations after the weekend on how to handle any cutbacks in his department. On Monday morning, April 7, McAllister further informed Dickenson that she had decided that all five layoffs would be of Quality Control Technicians. Dickenson then recommended that, in that case, the five most junior Quality Control Technicians be terminated, because that would be "easier for everyone to understand."
 
 
 9
 Later on April 7, Reed again met with his division managers. Weymouth, the Industrial Relations Manager, reported that one Quality Control Technician had volunteered for early retirement. With the quota now at four, McAllister recommended that Quality Control Technicians make up that number, suggesting that the remaining seven could perform their necessary functions by deleting inspections which had previously been performed by the foremen in the manufacturing division. Reed concurred with McAllister's suggestion, and the four most junior Quality Control Technicians were advised during their shifts on April 8 that they would be terminated.
 
 
 10
 Meanwhile, on April 7, the Union filed a petition with the Board seeking representation of a bargaining unit consisting of all twelve Quality Control Technicians at the Madison plant. The next morning, at about 10:00 or 11:00 a.m., Weymouth received a telephone call from a Board employee in the regional office telling him that a petition had been filed and asking him whether he had received a copy. Weymouth replied that he had not. At this time, Weymouth testified, he was unaware of any planned termination of Quality Control Technicians other than the five which were previously scheduled.
 
 
 11
 Later that morning, around noon, Weymouth met with Reed and told him that he had received the above-described telephone call. At 2:00 p.m., Reed called Twickler and told him that he had just heard that the Quality Control Technicians had petitioned for "joining the Union." Twickler responded that "it sounded like an effort to move under the umbrella of the Union to protect their job, that unfortunately was not available to them."
 
 
 12
 Immediately following this conversation, Reed informed McAllister that the remaining seven Quality Control Technicians would be terminated, and that, in the future, three quality control foremen were to perform the quality control work. Reed testified that he had reached this decision on the afternoon of April 8. The remaining seven Quality Control Technicians were told on April 9 and 10 of the decision to terminate them on April 10. All received severance pay, the amount of which was based on length of service with the Company. The termination of these seven employees was the subject of the complaint.
 
 
 13
 On April 8, after telling McAllister that the three quality control foremen would have to perform the quality control work, Reed decided to reorganize the quality control function at the Madison plant, and to replace it with the position of "Quality Area Supervisor." By April 10 or 11, after discussions with the three foremen about having other persons perform the quality control work in addition to the foremen, Reed determined that six Quality Assurance Supervisors would be hired to replace the seven Quality Control Technicians, and that they would be compensated at a rate which was three grade levels above that for the former Quality Control Technicians.
 
 
 14
 On April 14, the Company's Industrial Relations Department posted the following notice in the Madison plant:
 
 CANDIDATE SPECIFICATIONS
 
 15
 Due to a reorganization, several positions of "quality area supervisor" are available. Interested candidates should apply to personnel no later than Wednesday, April 16, 1986 by 7:00 a.m.
 
 
 16
 EXPERIENCE: Supervisory and/or quality assurance
 
 EDUCATION: College helpful
 
 17
 The personnel director of the plant contacted only four of the eleven terminated Quality Control Technicians about the new positions, all of whom were hired on the same day the notice was posted. The Company also selected two line foremen from the manufacturing division from among the other applicants for the final two positions.
 
 
 18
 The job responsibilities for the Quality Assurance Supervisors are, except in marginal areas, identical to those of the Quality Control Technicians. Moreover, the chain of command in the technical and quality control division remained the same; despite their designation as "supervisors," the Quality Assurance Supervisors have no authority to discipline employees and have no employees under them. While, unlike the Quality Control Technicians, the Quality Assurance Supervisors were trained to perform some of their inspection and audit functions on a new computer system, and were, on the basis of that training, required to use the system, the ALJ concluded that the Company intended to give the Quality Control Technicians the same training.
 
 
 19
 The Union filed its charge against the Company on April 11, 1986, and its amended charge on May 5, 1986. A complaint was issued on May 5, 1986, and an amended complaint was issued on July 29, 1986, alleging that the Company violated Secs. 8(a)(1) and (3) of the Act by discharging the seven Quality Control Technicians for the purpose of discouraging activity on behalf of the Union. In concluding that the Company had indeed violated Secs. 8(a)(3) and (1), the ALJ, in an opinion adopted by the Board, noted that:
 
 
 20
 "... although the General Counsel must usually show that the employer knew about individual employees' union activities before the Board may conclude that the employer violated Sec. 8(a)(3), the General Counsel may also prevail by showing that the employer ordered general lay-offs for the purpose of discouraging union activity or in retaliation against its employees because of the union activities of some. This theory is viable even though some employees who actually opposed the union ... were laid-off with their pro-union counterparts." Birch Run Welding & Fabricating, Inc. v. N.L.R.B., 761 F.2d 1175, 1180 (6th Cir.1985), and cases cited. I conclude that the General Counsel has shown by a preponderance of the evidence that Respondent decided on 8 April 1986 to terminate the 7 alleged discriminatees because Respondent had just found out that the Union had filed a petition seeking to represent them. Although there is no evidence as to whether any of the employees in the proposed unit had in fact engaged in any union activity, Respondent clearly believed that some or all of them had. Thus, immediately after learning about the petition, general manager Reed telephoned vice president Twickler and (according to Twickler) said that Reed had just heard that the quality control technicians had petitioned for "joining the Union." Moreover, during this conversation Twickler admittedly remarked that "it sounded like an effort to move under the umbrella of the union to protect their job." If (as I find) such a belief motivated the termination of the 7 alleged discriminatees, their termination was unlawful whether or not Respondent was correct in that belief. Gulf-Wandes Corp., 233 NLRB 772, 778 (1977), enfd. in relevant part 595 F.2d 1074 (5th Cir.1979), and cases cited; Crucible, Inc., Division of Colt Industries, 228 NLRB 723, 729 (1977), and cases cited; Hedison Manufacturing Co., 249 NLRB 791, 808-809 (1980), enfd. 643 F.2d 32 (1st Cir.1981).
 
 II.
 
 21
 In requesting that we review the order of the Board, the Company's primary contention is that substantial evidence does not support the finding of the Board that the seven Quality Control Technicians were terminated in violation of Secs. 8(a)(1) and (3) because there is no evidence in the record that any of the twelve Quality Control Technicians ever engaged in protected activities.
 
 A.
 
 22
 Section 8(a)(1) of the Act, 29 U.S.C. Sec. 158(a)(1), provides that it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees" in the exercise of their rights of self-organization, to form, join or assist labor organizations, or to engage in other concerted activities, as set out in Sec. 7 of the Act. Section 8(a)(3) of the Act provides that it is an unfair labor practice for an employee to discriminate "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." By their clear language, an employer violates Secs. 8(a)(1) and (3) when it terminates employees because of union membership or in order to discourage union membership or activity. NLRB v. Oberle-Jordre Co., 777 F.2d 1119, 1120-21 (6th Cir.1985).
 
 
 23
 Where, as in this case, the employer asserts that there was a legitimate reason for its termination of employees, the General Counsel must demonstrate that anti-union animus was a motivating factor in the employer's decision. Once this prima facie showing has been made, the employer carries the burden of showing that the terminations would have taken place even if the protected activity had not taken place. NLRB v. Transportation Management Corp., 462 U.S. 393, 395 (1983) (adopting the analysis enunciated in Wright Line, 251 N.L.R.B. 1083 (1980)). The motivation of an employer is a question of fact, NLRB v. A & T Manufacturing, 738 F.2d 148, 149 (6th Cir.1984), and the Board's factual determination as to employer motivation must be upheld if it is supported by substantial evidence on the record considered as a whole. Id.; 29 U.S.C. Sec. 160(e). Improper anti-union motivation need not be proven by direct evidence, but may be inferred from the circumstances. Birch Run Welding & Fabricating, Inc. v. NLRB, 761 F.2d 1175, 1179 (6th Cir.1985). "The Board's inference of improper motivation must be upheld if it is reasonable in light of the proven facts." Id.
 
 
 24
 We have little difficulty in finding that there is substantial evidence to support the Board's finding that the terminations of the seven Quality Control Technicians were motivated by anti-union considerations. The record reflects that, as of April 7, after several conferences, management had decided to cope with the work slowdown by terminating four Quality Control Technicians (after one had volunteered for retirement), and that the four most junior employees would fill that quota. Several hours after receiving a telephone call from the Board, Reed suddenly changed the agreed-upon plan and called for the termination of the entire proposed bargaining unit. No intervening event, except the notification to the Company that a representation petition had been filed, occurred that would explain the Company's action.[1] Furthermore, although ambiguous as to animus, Twickler's remark to Reed that the filing of the petition "sounded like an effort to move under the umbrella of the Union to protect their jobs" is certainly evidence that management believed that union activity was taking place.
 
 
 25
 Moreover, the hiring of six "Quality Area Supervisors" to replace the Quality Control Technicians supports an inference that anti-union animus motivated the Company to terminate the Quality Control Technicians, where the new Quality Area Supervisors performed essentially the same tasks. The Company noted that the new employees were expected, after training, to use computers in their work; however, the Company made no attempt to train the seven senior Quality Control Technicians, and computer experience was not a requirement when the Company hired the new Quality Assurance Supervisors. Taken as a whole, there is substantial evidence in the record to support an inference that the terminations were the product of unlawful, anti-union considerations.
 
 B.
 
 26
 The Company argues, however, that the record contains no evidence that any of the twelve Quality Control Technicians actually engaged in protected activity, and that, therefore, there is not substantial evidence to support the Board's finding that Secs. 8(a)(1) and (3) were violated, citing Colonial Corporation v. NLRB, 427 F.2d 302 (6th Cir.1970).
 
 
 27
 In Colonial Corporation, the employer engaged in a general layoff of its workforce for economic reasons even though an outside union, Teamsters Local 327, was attempting to organize the employees. The court described the evidence as to union activity as follows:
 
 
 28
 There is no evidence that any of Colonial's employees, those retained or those discharged, were activists for, or even interested in, the union. There is no evidence that even one of the laid off or terminated employees was a union protagonist; nor that any signed application for membership in the Teamsters Union, or even evidenced a desire or intention to do so.
 
 
 29
 427 F.2d at 307. This court refused to enforce the Board's order holding that Colonial had violated Sec. 8(a)(3) because "there was no evidence that any employee, terminated or laid off, was discriminated against because of union adherence." 427 F.2d at 308. Similarly, this court refused to find that Colonial Corporation violated Sec. 8(a)(1) of the Act because:
 
 
 30
 The fact that knowledge of the Teamsters' planned drive came along shortly before implementation of plans already made, cannot convert justified economic reductions in the workforce into an unfair labor practice. In the absence of a showing of discrimination against employees and a company to thwart employee efforts to organize, Colonial cannot be held in violation of Section 8(a)(1). That section merely protects the rights of employees, (1) to join or assist labor organizations, or (2) to engage in concerted activities in order to bargain collectively or (3) to refrain from such activities except as affected by collective bargaining agreement, as authorized in Section 8(a)(3). No case has been cited to us, nor does our own research provide us with a decision which says that Section 8(a)(1) of the National Labor Relations Act was designed to assist the Teamsters, or any other union, to organize the employees of a company, without reference to the rights and wishes of such employees.
 
 
 31
 427 F.2d at 309, 310.
 
 
 32
 In the case sub judice, the only evidence that there was actual union activity is the fact that a representation petition was filed with the Board. However, because the Union files the petition, not the individual workers, we would have to accept such a petition as inferential evidence that the employees desired union membership.
 
 
 33
 We conclude that such an inference is valid. In order for a petition to be filed with the regional office of the Board, the Union must represent that it is acting on behalf of a substantial number of employees. Sec. 9(c)(1)(A). By rule, the Board defines "substantial" as at least thirty percent of the proposed bargaining unit. NLRB Rules and Regulations and Statements of Procedure, Series 8, Sec. 101.18. Evidence of that level of support must either be submitted along with the petition or shortly thereafter. Furthermore, 18 U.S.C. Sec. 1001 makes it a crime to willfully make a false statement in the representation petition, and a statement to that effect appears on the face of the petition.
 
 
 34
 Of course, the Board does not merely infer from the filing of a petition, or even from the submission of signed and dated authorization cards, that the thirty percent requirement has been met without independently confirming their validity. However, we need not draw such an inference; we need only infer that there was some union activity on the part of employees within the bargaining unit. Although it would have been preferable for the General Counsel to introduce the actual cards, or some other direct evidence that individual employees were engaged in union activity,[2] we do not think it unreasonable to infer from the fact that a petition was filed that at least one of the terminated Quality Control Technicians had expressed his or her support for the Union. Therefore, we find substantial evidence to support the Board's finding that the Company violated Secs. 8(a)(1) and (3) by discriminating against employees who were engaged in union activity.[3]
 
 III.
 
 35
 Accordingly, for the foregoing reasons, the order of the Board is enforced.[4]
 
 
 36
 RYAN, Circuit Judge, concurring in part and dissenting in part.
 
 
 37
 It appears to me that a violation of Section 8(a)(3) of the National Labor Relations Act, 29 U.S.C. Sec. 158 does not require proof that any employee in the putative bargaining unit was engaged in any protected activity or sought union representation. The essence of a violation of Sec. 8(a)(3) is that an employer has taken discriminatory action against an employee in order to discourage protected activity. A careful reading of Colonial Corporation v. NLRB, 427 F.2d 302 (6th Cir.1970) and Birch Run Welding & Fabricating, Inc. v. NLRB, 761 F.2d 1175 (6th Cir.1985) suggests to me that neither case requires a finding of union activity by an employee to establish a violation of Sec. 8(a)(3). Colonial Corporation is distinguishable from this case because there, the court found that the action taken by the employer against the employees was not discriminatory and therefore not a violation of Sec. 8(a)(3) because a violation of that section requires a showing of "both discrimination [by the employer] and a resulting discouragement of union membership." Colonial Corporation, 427 F.2d at 308 (quoting American Shipbuilding v. NLRB, 380 U.S. 300, 311 (1965)). In Birch Run, this court explained:
 
 
 38
 Specifically, the courts have held that although the general counsel must usually show that the employer knew about an individual employee's union activities before the Board may conclude that the employer violated Sec. 8(a)(3), the general counsel may also prevail by showing that the employer ordered general layoffs for the purpose of discouraging union activity or in retaliation against its employees because of the union activities of some. This theory is viable even though some employees who actually oppose the union ... were laid off with their pro-union counterpoints.... The focus of the theory is upon the employer's motive in ordering extensive layoffs rather than upon the anti-union or pro-union status of particular employees. The rationale underlying this theory is the general retaliation by an employer against the work force can discourage the exercise of Sec. 7 rights as effectively as adverse action taken against only known union supporters.
 
 
 39
 I agree that there is ample evidence in the record to show the petitioner's action in terminating the seven Quality Control Technicians on April 10, 1986, was discriminatory action against the employees and was motivated by the employer's belief that the employees, or some of them, were engaged in protected activity. Consequently, I concur in parts I and IIA of my brother's opinion, affirming the Board's finding of a violation of Sec. 8(a)(3).
 
 
 40
 I am unable to agree, however, that there is any evidence in the record, to say nothing of substantial evidence, to support the Board's finding of a violation of Sec. 8(a)(1).
 
 
 41
 To establish a violation of Sec. 8(a)(1) the Board must demonstrate that the employee was engaged in ... protected concerted activity, that the employer knew of the activity and its concerted nature, and that the employee's protected activity was a motivating factor prompting some adverse action by the employer. Ajax Paving Indus., Inc. v. NLRB, 713 F.2d 1214, 1216 (6th Cir.1983).
 
 
 42
 Armstrong Rubber correctly argues that the record contains no evidence that any of the Quality Control Technicians engaged in any protected activity. Indeed, the ALJ in her decision, stated that "... there is no evidence as to whether any of the employees in the proposed unit had in fact engaged in any union activity...." My colleague recognizes as much, but finds "inferential evidence that the employees' desired union membership", in the fact that the union filed a representation petition with the Board. I must respectfully disagree, because I can construct no valid syllogism that permits a logical inference of protected employee union activity, from proof that a labor union filed a representation petition with the NLRB. To me, there is no logical nexus between the two.
 
 
 43
 For the foregoing reasons, I agree that the order of the Board should be enforced, but only with respect to its finding of a violation of Sec. 8(a)(3).
 
 
 
 [1]
 Twickler testified that he called Reed during the morning of April 8 and suggested that he might have to terminate five or six additional salaried personnel, and that he probably reviewed that conversation with Reed that afternoon. However, Reed did not testify as to any such morning conversation. The ALJ concluded that no such conversation had taken place, and that credibility finding is entitled to great weight. Carrier Corp. v. NLRB, 768 F.2d 778 (6th Cir.1985)
 
 
 [2]
 We note that this is a very close case, and that our ability to draw inferences from the record could have led us to deny enforcement if the employer had offered even minimal evidence that there was, in fact, no union activity on the part of the employees. The General Counsel should not be persuaded by our conclusion here that future orders will be enforced without more diligent preservation of the record below
 
 
 [3]
 We are aware that Birch Run Welding, supra, as relied upon by the ALJ, appears to be at odds with Colonial Corporation. However, because we conclude that Colonial Corporation is distinguishable in that Union activity can be inferred in this case, we need not attempt a reconcilliation between the two cases
 
 
 [4]
 The Company also argues that the remedy ordered by the Board, i.e., reinstatement to the position of quality area supervisor (with an attendant pay increase) does not effectuate the policies of the Act, 29 U.S.C. Sec. 160(c), because the Board required "promotions" of the discriminatees to "supervisory" positions at a higher salary. However, to find any merit to this argument, we would have to accept the contention, which we have already rejected, that there was a material difference in the "supervisory" nature of the two positions